CALEB R. TROTTER, Cal. Bar No. 305195
Email: CTrotter@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
JAMES M. MANLEY, Ariz. Bar No. 031820*
Email: JManley@pacificlegal.org
Pacific Legal Foundation
3241 E. Shea Blvd. # 108
Phoenix, Arizona 85028
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
*Pro Hac Vice Pending

*Attorneys for Plaintiffs American Society of Journalists and Authors, Inc.,
and National Press Photographers Association*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| AMERICAN SOCIETY OF JOURNALISTS AND AUTHORS, INC., and NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION,<br><br>              Plaintiffs,<br><br>      v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>              Defendant. | Case No.: 2:19-cv-10645-PSG (KS)<br>Judge: Hon. Philip S. Gutierrez<br>Hearing Date: March 9, 2020<br>Time: 1:30 P.M.<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENT

TABLE OF AUTHORITIES ..................................................................3

MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION ...................................8

I.    LEGAL AND FACTUAL BACKGROUND...................................8

  A.    Legal Background of AB 5 ...............................................8

  B.    The Harm to Journalists from AB 5..................................10

  C.    AB 5's Unconstitutionally Narrow Exemptions................12

II.   STANDARD OF DECISION.......................................................13

III.  ANALYSIS...................................................................................14

  A.    Likelihood of Success on the Merits.................................14

    1.    The Equal Protection Clause Forbids Arbitrary Exemptions
      to Economic Regulations............................................14

    2.    The Speech and Press Clauses of the First Amendment Forbid
      Differential Treatment Based on the Content or Method of Speech .......16

     a.    AB 5 Limits the Definition of Professional Services Based on the
       Content of Speech ...................................................18

     b.    AB 5 Limits the Definition of Professional Services Based on What
       Medium of Expression a Speaker Uses...................................20

  B.    Journalists Will Suffer Irreparable Harm from the Violation of Their
    Constitutional Rights.......................................................21

  C.    The Balance of Equities Weighs in Journalists' Favor.............................22

  D.    A Preliminary Injunction Would Serve the Public Interest.......................23

IV.   CONCLUSION.............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................14

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ........................................................17

*Animal Legal Def. Fund v. Herbert*,
  263 F. Supp. 3d 1193 (D. Utah 2017)................................................20

*Arkansas Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987)................................................................18–19

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983)..................................................................21

*Carey v. Brown*,
  447 U.S. 455 (1980)..................................................................14

*Citizens for Free Speech, LLC v. County of Alameda*,
  62 F. Supp. 3d 1129 (N.D. Cal. 2014)................................................22

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993)..............................................................20–21

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994)..............................................................18, 20

*City of Lakewood v. Plain Dealer Pub'g Co.*,
  486 U.S. 750 (1988)..................................................................17

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989)..................................................................11

*Craigmiles v. Giles*,
  312 F.3d 220 (6th Cir. 2002) ........................................................15

*Dynamex Operations West, Inc. v. Superior Court of Los Angeles*,
   4 Cal. 5th 903 (2018) ........................................................................8–9

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975)..........................................................................19

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) .......................................................22–23

*Fordyce v. City of Seattle*,
   55 F.3d 436 (9th Cir. 1995) ............................................................20

*Gonzales v. San Gabriel Transit, Inc.*,
   2019 WL 4942213 (Cal. Ct. App. Oct. 8, 2019) ................................9

*Harwin v. Goleta Water Dist.*,
   953 F.2d 488 (9th Cir. 1991) ...........................................................19

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) ...........................................................17

*Interpipe Contracting, Inc. v. Becerra*,
   898 F.3d 879 (9th Cir. 2018) ...........................................................16

*Jacobellis v. Ohio*,
   378 U.S. 184 (1964)..........................................................................20

*Ladd v. Law & Tech. Press*,
   762 F.2d 809 (9th Cir. 1985) ...........................................................19

*Lovell v. City of Griffin*,
   303 U.S. 444 (1938)..........................................................................16

*Merrifield v. Lockyer*,
   547 F.3d 978 (9th Cir. 2008) .......................................................14–16

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
   460 U.S. 575 (1983).....................................................................17–19

*Nixon v. Shrink Missouri Gov't PAC*,
   528 U.S. 377 (2000)..........................................................................18

*Police Dep't of City of Chicago v. Mosley*,
    408 U.S. 92 (1972) ........................................................................14

*Preminger v. Principi*,
    422 F.3d 815 (9th Cir. 2005) ........................................................23

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ...........................................................17–20

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988) ......................................................................17

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations*,
    48 Cal. 3d 341 (1989) ...............................................................9, 12

*Sammartano v. First Judicial District Court, in and for County of
    Carson City*, 303 F.3d 959 (9th Cir. 2002) ............................22–23

*Sanders County Republican Cent. Committee v. Bullock*,
    698 F.3d 741 (9th Cir. 2012) ........................................................22

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ......................................................................17

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ......................................................................17

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ......................................................22

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ......................................................23

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) ......................................................................17

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ........................................................22

*Winter v. National Resources Defense Council*,
    555 U.S. 7 (2009) ...................................................................*passim*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Rules**

Fed. R. Civ. P. 65 ..................................................................................8

**Statutes**

Cal. Labor Code § 246 .........................................................................10

Cal. Labor Code § 2750.3 .......................................................................8

Cal. Labor Code § 2750.3(a)(1) ..........................................................8–9

Cal. Labor Code § 2750.3(a)(1)(B)....................................................9,11

Cal. Labor Code § 2750.3(c)(1) ...........................................................12

Cal. Labor Code § 2750.3(c)(2)(B)......................................................19

Cal. Labor Code § 2750.3(c)(2)(B)(i)–(viii), (xi)................................12

Cal. Labor Code § 2750.3(c)(2)(B)(ix).....................................13, 15, 20

Cal. Labor Code § 2750.3(c)(2)(B)(ix) and (x) ...................................13

Cal. Labor Code § 2750.3(j) ..................................................................9

Cal. Labor Code § 3600 ........................................................................10

Cal. Un. Ins. Code § 1251 ....................................................................10

Cal. Un. Ins. Code § 2625 ....................................................................10

Cal. Un. Ins. Code § 3303 ....................................................................10

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice
    and Procedure § 2948.1 (2013)..........................................................21

https://twitter.com/LorenaSGonzalez/status/
    1197546573158158336?s=20 .............................................................9

https://www.dir.ca.gov/dlse/faq_overtimeexemptions.htm .......................9

Kilkenny, Katie, "Everyone is Freaking Out",
    Hollywood Reporter Oct. 17, 2019,
    https://www.hollywoodreporter.com/news/everybody-is-freaking-
    freelance-writers-scramble-make-sense-new-california-law-
    1248195..............................................................................................................20

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On behalf of their members, Plaintiffs American Society of Journalists and Authors (ASJA) and the National Press Photographers Association (NPPA) (collectively "Journalists") respectfully move for a preliminary injunction pursuant to Fed. R. Civ. P. 65 against Assembly Bill 5 (AB 5, codified at Cal. Labor Code § 2750.3, *et seq*.), which draws unconstitutional content-based distinctions about who can independently contract ("freelance"), limiting certain speakers to 35 submissions per client, per year, and precluding some freelancers from making video recordings. When AB 5 goes into effect January 1, 2020, Defendant should be enjoined from enforcing the law to the extent its content-based distinctions unduly burden Journalists' First and Fourteenth Amendment rights.

## I. LEGAL AND FACTUAL BACKGROUND

### A. Legal Background of AB 5

California recently enacted AB 5, which codifies and expands the independent contractor test established in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018). *Dynamex* created a new three-part test that requires independent contractors to be classified as employees under certain California wage orders, unless the hiring entity proves that:

(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact, (B) that the worker performs work that is outside the usual course of the hiring entity's business, and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Id*. at 964. *See also* Cal. Labor Code § 2750.3(a)(1). Failure to prove any element of this ABC test results in the independent contractor being classified as an employee.

*Id*. The *Dynamex* ABC test overruled a prior multi-factor balancing test that considered the economic realities of the employment relationship. *See S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989). Under *Borello*, freelancers like the Journalists represented here worked as independent contractors for decades. Clark Dec. ¶¶ 4–5; Dotinga Dec. ¶ 2; Grant Dec. ¶ 2; Feulner Dec. ¶¶ 2, 5; Osterreicher Dec. ¶ 2.

*Dynamex* was limited to the "suffer or permit to work" standard in California wage orders and "equivalent or overlapping non-wage order allegations arising under the Labor Code." *Gonzales v. San Gabriel Transit, Inc.*, 2019 WL 4942213, *14 (Cal. Ct. App. Oct. 8, 2019). Wage orders govern issues like minimum wage, overtime pay, meals, and lodging. Professionals engaged in "original and creative" work, like Plaintiffs' members, are largely exempt from wage orders, and thus *Dynamex* had little direct effect on their work.[1]

By contrast, the new AB 5 legislation applies the strict *Dynamex* ABC test to the entire Labor Code, the Unemployment Insurance Code, and wage orders. Cal. Labor Code § 2750.3(a)(1). AB 5's expansion of the ABC test means that freelancers like the writers, photographers, and videographers who comprise Plaintiffs' memberships must be classified as employees of the publishers for which they produce content because content creation is "the usual course of the hiring entity's business." Cal. Labor Code § 2750.3(a)(1)(B). AB 5 also grants specific enforcement authority to Defendant "[i]n addition to any other remedies available," to bring an action for injunctive relief. Cal. Labor Code § 2750.3(j). This new enforcement authority means that even freelancers who wish to work independently can be forced to become employees. Indeed, the sponsor of AB 5 has encouraged proactive use of the enforcement authority granted by the law.[2]

[1] https://www.dir.ca.gov/dlse/faq_overtimeexemptions.htm
[2] https://twitter.com/LorenaSGonzalez/status/1197546573158158336?s=20

1  In short, AB 5 threatens to end the freelance careers of journalists who are
2  not exempted from the bill's ABC test.

3  **B.     The Harm to Journalists from AB 5**

4  ASJA and the NPPA are two of the leading voices for freelance writers and
5  news photographers in the United States. Dotinga Dec. ¶ 2; Osterreicher Dec. ¶ 9.
6  ASJA was founded in 1948 and is the nation's largest professional organization of
7  independent nonfiction writers. Dotinga Dec. ¶ 2. Its membership consists of
8  freelance writers of magazine articles, trade books, and many other forms of
9  nonfiction writing, each of whom has met exacting standards of professional
10  achievement. Dotinga Dec. ¶ 2.

11  Chartered in 1946, NPPA is the nation's leading professional organization for
12  visual journalists. Osterreicher Dec. ¶ 9. Its membership includes news
13  photographers from print, television, and electronic media. *Id*. NPPA has 536
14  members in the State of California. *Id*. On behalf of its members, NPPA works to
15  support its members' copyrights and opposes violations of First Amendment rights
16  to report on news and matters of public concern. *Id*.

17  These organizations bring this lawsuit to vindicate their members' rights to
18  speak as independent professional freelancers.

19  Reclassifying freelance journalists as employees brings significant new costs
20  and disadvantages. For professionals engaged in "original and creative" work, the
21  main changes wrought by AB 5 are added costs to pay unemployment taxes[3],
22  workers' compensation taxes[4], state disability insurance[5], paid family leave[6], and
23  sick leave.[7] *See* Clark Dec. ¶¶ 10, 20. Some of these costs are borne by the employer,
24  but they all make the freelancer's work more expensive—and thus less attractive—

[3] Cal. Un. Ins. Code § 1251.
[4] Cal. Labor Code § 3600.
[5] Cal. Un. Ins. Code § 2625.
[6] Cal. Un. Ins. Code § 3303.
[7] Cal. Labor Code § 246.

to the employer. *See* Clark Dec. ¶ 20; Dotinga Dec. ¶ 8; Grant Dec. ¶ 6; Osterreicher Dec. ¶ 14. The additional burden on freelancers' ability to sell their communicative work is a direct result of their classification as employees under AB 5's "usual course of the hiring entity's business" prong. Cal. Labor Code § 2750.3(a)(1)(B). The threat of enforcement has already resulted in lost employment opportunities for freelancers. Clark Dec. ¶¶ 20–21; Dotinga Dec. ¶ 14; Osterreicher Dec. ¶ 16.

In addition to these unavoidable costs of employment, erstwhile freelancers who are forced to become employees because of AB 5 will also lose ownership of the copyright to their creative work and control of their workload. Clark Dec. ¶¶ 9, 11–12, 25; Dotinga Dec. ¶¶ 5, 7–10, 12; Grant Dec. ¶¶ 3, 6–7, 10; Feulner Dec. ¶¶ 4, 7–9, 11; Osterreicher Dec. ¶¶ 10–12, 15.

Control over the copyright of their work is especially pressing for freelance photographers, who routinely license their work but retain ownership of the copyright. Feulner Dec. ¶ 11; Osterreicher Dec. ¶¶ 10–12. Under the Copyright Act, the copyright in a work created by an independent contractor photographer is owned by the creator. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989). However, the copyright in a work created by an employee is owned by the employer. *Id*. Writers, too, benefit substantially from the ability to republish work that they create as freelancers. Clark Dec. ¶ 9; Dotinga Dec. ¶ 10. Freelance journalists who are forced to become employees due to AB 5 will lose the copyright to their work. Clark Dec. ¶ 9; Dotinga Dec. ¶ 10; Osterreicher Dec. ¶¶ 10–12.

Control over their workload is a primary concern for every freelancer. Indeed, control is what leads many freelancers to make the choice to work independently. Clark Dec. ¶¶ 11–12, 25; Dotinga Dec. ¶¶ 7–9, 12; Grant Dec. ¶¶ 6–7, 10; Feulner Dec. ¶¶ 4, 7–8; Osterreicher Dec. ¶ 15. In a tumultuous industry that continues to lay off employees by the thousands, freelancers find safety in flexibility. Clark Dec. ¶¶ 5, 8, 12–13; Dotinga Dec. ¶¶ 8–9, 12–13; Grant Dec. ¶ 6; Feulner Dec. ¶¶ 2, 4, 7–8; Osterreicher Dec. ¶¶ 14–15. Rather than being tied to a

single employer, freelancers are able to adapt their workload to their financial needs, balance their work with their other responsibilities, and spread their workload across multiple clients to minimize risk. Clark Dec. ¶¶ 4, 12, 14; Dotinga Dec. ¶¶ 3, 7, 9; Grant Dec. ¶¶ 4, 7; Feulner Dec. ¶¶ 4, 12–13; Osterreicher Dec. ¶ 15. That flexibility even extends to business decisions, for example the choice to attend a conference or event is entirely the freelancers'. Clark Dec. ¶ 10; Dotinga Dec. ¶ 4. In addition, a freelancer can deduct these and other business expenses on their federal taxes, which an employee is not able to deduct. Clark Dec. ¶ 10; Dotinga Dec. ¶¶ 4, 11; Grant Dec. ¶ 8; Feulner Dec. ¶ 10. They are also able to maintain benefits like healthcare and retirement accounts, regardless of the number of publishers they produce content for or the frequency and quantity of their work. Dotinga Dec. ¶¶ 4, 11; Feulner Dec. ¶ 10. And that flexibility is even more important in the digital space which, unlike the traditional print model, allows for a higher volume of submissions to a greater variety of publications. Clark Dec. ¶¶ 13, 15–17; Dotinga Dec. ¶ 16. Losing the freedom to freelance would upend years-long careers built on this freedom and flexibility. Clark Dec. ¶ 21; Dotinga Dec. ¶ 13; Grant Dec. ¶¶ 4, 11; Feulner Dec. ¶¶ 14–15; Osterreicher Dec. ¶ 16.

## C.   AB 5's Unconstitutionally Narrow Exemptions

As dramatic a shift as AB 5 represents, the legislature responded to intense lobbying efforts by granting dozens of seemingly random exemptions to the strict three-part ABC test. Among its many exemptions, AB 5 excludes people who work pursuant to "a contract for 'professional services.'" Cal. Labor Code § 2750.3(c)(1). These exempt professionals remain subject to the existing *Borello* independent contractor test. *Id*. "Professional services" are defined as marketers, human resources administrators, travel agents, graphic designers, grant writers, fine artists, IRS enrolled agents, payment processing agents through an independent sales organization, estheticians, electrologists, manicurists, barbers, and cosmetologists. Cal. Labor Code § 2750.3(c)(2)(B)(i)–(viii), (xi). Additionally, still photographers,

photojournalists, freelance writers, editors, and newspaper cartoonists are included in "professional services," but with important limitations at issue here: (1) these speaking professions are limited to 35 "content submissions" per client, per year, Cal. Labor Code § 2750.3(c)(2)(B)(ix) and (x); and (2) any video recording is expressly excluded from the still photography and photojournalism exemption, Cal. Labor Code § 2750.3(c)(2)(B)(ix). Striking these limits on the definition of "professional services" would fully protect Journalists' right to freelance on the same terms as other speaking professionals who are already included in the definition and would resolve Journalists' constitutional claims against AB 5.

The definition of "professional services" violates the First Amendment because it imposes penalties on certain photographers and writers who exceed the 35-submission limit, and because it limits the definition of professional services based on who uses video as a medium of expression. Plaintiffs' members are working journalists, authors, photographers, and videographers who face an immediate and irreparable chilling effect on their First Amendment activity because of the content-based limits on freelancing imposed by AB 5's definition of "professional services." These limits violate both the Equal Protection Clause of the Fourteenth Amendment and the Free Speech and Press Clauses of the First Amendment. AB 5 goes into effect on January 1, 2020; enforcement of these limits on the definition of "professional services" should be enjoined to maintain the status quo during the pendency of this lawsuit.

## II.   STANDARD OF DECISION

A preliminary injunction to prevent Defendant's enforcement of AB 5's content-based limits on freelancing is appropriate because: (1) Journalists are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. National Resources Defense Council*, 555 U.S. 7, 20 (2009). The Ninth Circuit has articulated a variation of the *Winter*

test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Journalists are entitled to a preliminary injunction because each of the *Winter* factors is met.

## III.  ANALYSIS

**A.   Likelihood of Success on the Merits**

> **1.    The Equal Protection Clause Forbids Arbitrary Exemptions to Economic Regulations**

AB 5's definition of professional services draws arbitrary distinctions between speaking professionals based on the content of their speech and the mode of their expression. By limiting writers and photographers to 35 submissions and generally prohibiting certain freelancers from recording video, AB 5 imposes a special burden on the content these speakers produce, in the form of the employment taxes and other regulatory and practical burdens discussed above that do not apply to other freelancers. The arbitrary distinctions drawn by AB 5 between different kinds of freelancers are subject to strict scrutiny, because "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972). It is presumptively unconstitutional to draw arbitrary distinctions between speaking professionals, and the government bears the burden to prove otherwise. *Carey v. Brown*, 447 U.S. 455, 459–471 (1980). Defendant will not be able to meet his burden under strict scrutiny and Journalists are likely to succeed on the merits of their Equal Protection claim.

Even under rational basis review the Ninth Circuit has held that it violates the Equal Protection Clause for the government to draw arbitrary exemptions to generally applicable economic regulations. In *Merrifield v. Lockyer*, Alan Merrifield

challenged a law that required him to obtain a license for non-pesticide pest control of "mice, rats, or pigeons," but exempted non-pesticide pest controllers of "bats, raccoons, skunks, and squirrels." 547 F.3d 978, 988–89 (9th Cir. 2008). The court held it irrational to base a licensing requirement on the particular type of pest controlled. Citing the Sixth Circuit's equal protection analysis in *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), the Ninth Circuit determined that "the singling out of a particular economic group, with no rational or logical reason for doing so, was strong evidence of an economic animus with no relation to public health, morals or safety." *Merrifield*, 547 F.3d at 989. The court ruled that the "license exemption to the extent it does 'not include mice, rats, or pigeons' is unconstitutional." *Id*. at 992.

AB 5 similarly limits its "professional services" exemption with no rational basis. The only "professional services" subject to the 35-submission limit are freelance writers, editors, newspaper cartoonists, still photographers, and photojournalists. Moreover, certain freelancers are excluded entirely from the definition of "professional services" if they shoot video, both because the photography exemption is limited to "[s]ervices provided by a *still* photographer or photojournalist" (emphasis added), and because it explicitly does not apply to "an individual who works on motion pictures, which includes, but is not limited to, projects produced for theatrical, television, internet streaming for any device, commercial productions, broadcast news, music videos, and live shows, whether distributed live or recorded for later broadcast, regardless of the distribution platform." Cal. Labor Code § 2750.3(c)(2)(B)(ix).

For example, under AB 5, writers of marketing materials, perhaps news releases, can freelance freely; but if they write articles *about* that same news release, they are subject to the 35-submission limit. If a photographer takes pictures for the purpose of marketing a company, they have no limit, but if that photographer takes photographs to communicate in a newspaper about a matter of public concern related to that same company, they are subject to a 35-submission limit. Freelance graphic

artists can submit unlimited infographics to a newspaper; freelance photojournalists are capped at 35 submissions. If photographers take only still photographs, they are subject to the 35-submission limit; take a single video (often with the same camera) and they lose the ability to freelance.

AB 5 articulates no rationale for allowing unlimited freedom to freelance for fine artists, marketing, graphic design, human resources, and grant writing professionals, some limited freedom for still photographers, and no freedom for video recording. If the state's interest is in regulating the economic relationship between content creator and content publisher, the distinctions AB 5 has drawn between different types of freelancers have no apparent connection to that interest. "Needless to say, this type of singling out, in connection with a rationale so weak that it undercuts the principle of non-contradiction, fails to meet the relatively easy standard of rational basis review." *Merrifield*, 547 F.3d at 991. Because the limits on "professional services" in AB 5 fail even rational basis review, Journalists are likely to succeed on the merits of their Equal Protection claims.

## 2. The Speech and Press Clauses of the First Amendment Forbid Differential Treatment Based on the Content or Method of Speech

Even if AB 5's definition of "professional services" did not fail under the Equal Protection Clause, it is nevertheless unconstitutional under the First Amendment because its distinctions are based entirely on either (1) the content of speech; or (2) what medium of expression a speaker uses.

This speech-based limit on freelancing is subject to First Amendment scrutiny because it "(1) target[s] a particular type of entity for differential treatment, and (2) regulate[s] the ingredients necessary to effectuate that entity's First Amendment rights." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 896 (9th Cir. 2018); *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (noting "liberty of publishing" is essential to freedom of the press (quotation omitted)). Strict scrutiny applies even

1   when the government burdens, rather than bans, protected speech on the basis of

2   content. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000)

3   ("The Government's content-based burdens must satisfy the same rigorous scrutiny

4   as its content-based bans."); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011)

5   ("Lawmakers may no more silence unwanted speech by burdening its utterance than

6   by censoring its content."). *See also Simon & Schuster, Inc. v. Members of N.Y. State

7   Crime Victims Bd.*, 502 U.S. 105, 115 (1991) (content-based financial burden);

8   *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575

9   (1983) (speaker-based financial burden).

10      That the economic interests of journalists are at stake does not diminish their

11  First Amendment protections. *See City of Lakewood v. Plain Dealer Pub'g. Co.*, 486

12  U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection is not

13  diminished merely because the [protected expression] is sold rather than given

14  away."); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 801 (1988) ("It is

15  well settled that a speaker's rights are not lost merely because compensation is

16  received; a speaker is no less a speaker because he or she is paid to speak.");

17  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062–63 (9th Cir. 2010) (same).

18  Although general economic regulations can apply to the press, "cases approving

19  such economic regulation, however, emphasized the general applicability of the

20  challenged regulation to all businesses … a regulation that single[s] out the press …

21  place[s] a heavier burden of justification on the State." *Minneapolis Star & Tribune

22  Co.*, 460 U.S. at 583. *Cf. Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389,

23  408 (9th Cir. 2015) (upholding minimum wage law that did not "'singl[e] out those

24  engaged in expressive activity' such as newspapers or advocacy organizations.").

25      Content-based distinctions like those drawn by AB 5 are "presumptively

26  unconstitutional and may be justified only if the government proves that they are

27  narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*,

28  135 S. Ct. 2218, 2226 (2015). The burden is on Defendant to justify a rule that

singles out freelance writers, editors, newspaper cartoonists, still photographers, and photojournalists from the definition of professional services that applies to other speaking professionals. *Id.* This is a "heavy burden," which requires Defendant to offer evidence of a causal link between the limits AB 5 imposes on "professional services" and a compelling government interest. *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 379 (2000) ("This Court has never accepted mere conjecture as adequate to carry a First Amendment burden ...."). *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) (Regulatory exemptions "may diminish the credibility of the government's rationale for restricting speech in the first place."). Defendant will not be able to meet his burden under strict scrutiny and Journalists are likely to succeed on the merits of their First Amendment claims.

### a.  AB 5 Limits the Definition of Professional Services Based on the Content of Speech

It is unconstitutional to target freelance jounalists for especially unfavorable treatment. *Minneapolis Star & Tribune Co.*, 460 U.S. at 583. In *Minneapolis Star*, the Court struck down a Minnesota tax on paper and ink because it "singled out the press for special treatment," burdening First Amendment rights without demonstrating that the differential treatment was necessary to achieve an overriding governmental interest. *Id.* at 582. The Minnesota law unconstitutionally discriminated against the press, even though there was "no indication, apart from the structure of the tax itself, of any impermissible or censorial motive on the part of the legislature." *Id.* at 580. Singling out the press is enough to draw a law into First Amendment scrutiny.

Similarly, in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987), the Court struck down a sales tax on periodicals that exempted "religious, professional, trade, or sports periodical[s]" after it was challenged by a publication that did not fall within any of those exemptions. *Id.* at 226. The Court held that "official scrutiny of the content of publications as the basis for imposing a tax is

entirely incompatible with the First Amendment[]." *Id*. at 230. As in *Minneapolis Star & Tribune*, the Court found no "improper censorial motive," but struck down the arbitrary tax exemptions "because selective taxation of the press—either singling out the press as a whole or targeting individual members of the press—poses a particular danger of abuse by the State." *Id.* at 228.

Like the unconstitutionally narrow tax exemption struck down in *Arkansas Writers' Project,* AB 5's professional services exemption is "triggered by the publication of ideas," and denies the freedom to freelance based entirely on the content of a freelancer's expression. *Ladd v. Law & Tech. Press*, 762 F.2d 809, 815 (9th Cir. 1985). As in *Arkansas Writers' Project*, the only way to know if AB 5's professional services exemption applies is through "official scrutiny of the content of publications." *Id*. at 230. The ability to freelance rises or falls based on whether expression is deemed marketing or editorial, graphic design or photography, grant writing or news reporting—the only way to know if the "professional services" exemption applies is to analyze the content of the expression. While the Supreme Court has held that "a legislature may deal with one part of a problem without addressing all of it," that rule "has less force when a classification turns on the subject matter of expression." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215 (1975). Thus, a "regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions." *Id*. AB 5 "singl[es] out the press as a whole" for unfavorable treatment under California labor law, denying full freedom to freelance only to those writers and photographers who do not fit within the content-based exemptions for fine artists, marketing, graphic design, and grant writing. Cal. Labor Code § 2750.3(c)(2)(B).

The Supreme Court has consistently held that the government cannot discriminate in the First Amendment context unless it can show that the discrimination is necessary to serve a substantial governmental interest. *Harwin v. Goleta Water Dist.*, 953 F.2d 488, 490 (9th Cir. 1991); *Reed*, 135 S. Ct. at 2226. The

- 19 -

sponsor of AB 5 has admitted that the 35-submission limit was not tailored to achieve a significant governmental interest; rather, it was "a little arbitrary."[8] Arbitrary line drawing does not meet the First Amendment's high standard. *Id*.

### b.  AB 5 Limits the Definition of Professional Services Based on What Medium of Expression a Speaker Uses

In addition to the 35-submission limit discussed above, AB 5's limits on video recording impose content-based limits on which freelancers can record video. Specific types of content creators, including fine artists, marketers, and graphic designers are free to take and use videos to communicate their ideas, but freelance photographers and journalists are explicitly denied that freedom. Cal. Labor Code § 2750.3(c)(2)(B)(ix).

Video recording is a form of expression protected by the First Amendment. *Jacobellis v. Ohio*, 378 U.S. 184, 187 (1964) ("Motion pictures are within the ambit of the constitutional guarantees of freedom of speech and of the press."); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1206–08 (D. Utah 2017) (collecting cases protecting the First Amendment right to make an audiovisual recording). By limiting which freelancers can use video, AB 5's "regulation of a medium inevitably affects communication itself …." *City of Ladue*, 512 U.S. at 48. Indeed, writers and photographers who do not fit into AB 5's content-based freelancing exemptions face two options: do not record video or lose the freedom to freelance. Feulner Dec. ¶ 14; Clark Dec. ¶ 18. That is an intolerable choice. The Supreme Court has stated the rule plainly: the government may not selectively burden access to a medium of expression by exempting some types of content, but not others. *See City of Cincinnati v. Discovery*

[8] https://www.hollywoodreporter.com/news/everybody-is-freaking-freelance-writers-scramble-make-sense-new-california-law-1248195

1   *Network, Inc.*, 507 U.S. 410, 427 (1993) (news racks); *Bolger v. Youngs Drug*
2   *Products Corp.*, 463 U.S. 60 (1983) (mail).

3   AB 5's exclusion of video recording from the definition of "professional
4   services" for journalists reaches into the journalist's toolbox and micromanages how
5   information can be gathered and communicated. The undue and chilling burdens
6   created by AB 5's exclusion of video recording are an affront to core First
7   Amendment freedoms.

8   AB 5's content-based limits on video recording function much like the limits
9   on news racks the Court struck down in *Discovery Network*. There, the city of
10  Cincinnati banned news racks containing "commercial handbills," but not news
11  racks containing "newspapers." *Discovery Network*, 507 U.S. at 418. By burdening
12  access to one medium of expression on the basis of content, the City imposed a
13  content-based restriction on speech that was subject to, and failed, First Amendment
14  scrutiny. *Id*. The Court relied on its previous decision in *Bolger*, where the Court
15  struck down content-based regulations about which speakers could use the mail to
16  deliver their message. *Bolger*, 463 U.S. at 73. Likewise, AB 5 denies access to video
17  recording for freelancers who do not fall within its content-based definition of
18  professional services.

19  AB 5 provides no rational justification, and certainly no substantial
20  justification, for its content-based line drawing. Journalists are likely to succeed on
21  the merits of their First Amendment claims that AB 5's content-based line drawing
22  is unconstitutional.

23  **B.  Journalists Will Suffer Irreparable Harm from the**
24      **Violation of Their Constitutional Rights**

25  A plaintiff seeking preliminary relief must show a likelihood of irreparable
26  harm. *Winter*, 555 U.S. at 22. "When an alleged deprivation of a constitutional right
27  is involved, most courts hold that no further showing of irreparable injury is
28  necessary." 11A Charles Alan Wright, Arthur R. Miller, *et al*., Federal Practice and

Procedure § 2948.1 (2013). Indeed, "[u]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 973–74 (9th Cir. 2002); *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (same).

Because Journalists raise substantial constitutional claims, no further showing of irreparable injury is necessary. *See Sanders County Republican Cent. Committee v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012). Journalists have made "a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement"; therefore "the burden shifts to the government to justify the restriction." *Id.*

## C.   The Balance of Equities Weighs in Journalists' Favor

A plaintiff seeking a preliminary injunction must show that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. To assess the balance of hardships, the court "balance[s] the interests of all parties and weigh[s] the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). Mere "inconvenience" to the government does not compare to the hardship imposed by "the potential loss of a constitutionally protected right" like the right to write, photograph, and publish. *Citizens for Free Speech, LLC v. County of Alameda*, 62 F. Supp. 3d 1129, 1143 (N.D. Cal. 2014).

In the absence of unconstitutional limits on the definition of professional services, journalists will be subject to the same freelancing rules that apply to other speaking professionals already afforded full freedom to freelance by AB 5. Defendant will still be able to enforce California labor law but, critically, journalists will maintain the freedom to freelance under AB 5's exception for professional services. Any harms Defendant might imagine are "entirely speculative and in any event may be addressed by more closely tailored regulatory measures." *Ezell v. City*

1  *of Chicago*, 651 F.3d 684, 710 (7th Cir. 2011). The balance of equities favors

2  Journalists.

3  **D.    A Preliminary Injunction Would Serve the Public Interest**

4          A motion for preliminary injunction must show "that an injunction is in the

5  public interest." *Winter*, 555 U.S. at 20. Upholding First Amendment values is

6  always in the public interest: "Courts considering requests for preliminary

7  injunctions have consistently recognized the significant public interest in upholding

8  First Amendment principles." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1129

9  (9th Cir. 2011) (quote omitted); *Sammartano*, 303 F.3d at 974 ("[It] is always in the

10  public interest to prevent the violation of a party's constitutional rights." (quote

11  omitted)); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally,

12  public interest concerns are implicated when a constitutional right has been violated,

13  because all citizens have a stake in upholding the Constitution."). Given the primacy

14  of the constitutional rights at stake, a preliminary injunction is in the public interest.

15                          **IV.    CONCLUSION**

16          The freedom to write, photograph, and publish freely is at the core of the

17  protections guaranteed by the First Amendment. By subjecting those core freedoms

18  to freelancing rules that do not apply to other speaking professions, AB 5's definition

19  of professional services is unconstitutionally narrow, in violation of both the Equal

20  Protection Clause of the Fourteenth Amendment and the Free Speech and Press

21  Clauses of the First Amendment.

22          A preliminary injunction is appropriate to maintain the status quo and enjoin

23  enforcement of AB 5 to the extent it imposes a 35-submission limit on certain

24  speakers and to the extent it limits the definition of professional services based on

25  what medium of expression a speaker uses.

26  ///

27  ///

28  ///

---

1     DATED: December 20, 2019.

2                    Respectfully submitted,

3

4                    By___/s/ Caleb R. Trotter_____

5                        CALEB R. TROTTER

6                    CALEB R. TROTTER
                     (Cal. Bar No. 305195)

7                    Pacific Legal Foundation
                     930 G Street

8                    Sacramento, California 95814
                     Telephone:  (916) 419-7111

9                    Facsimile:  (916) 419-7747

10                   Email:  CTrotter@pacificlegal.org

11                   JAMES M. MANLEY

12                   (Ariz. Bar No. 031820*)
                     Pacific Legal Foundation

13                   3241 E. Shea Blvd. #108
                     Phoenix, Arizona 85028

14                   Telephone: (916) 419-7111

15                   Facsimile: (916) 419-7747
                     Email: JManley@pacificlegal.org

16                   *Pro Hac Vice Pending

17

18                   *Attorneys for Plaintiffs American Society of*

19                   *Journalists and Authors, Inc., and National*
                   *Press Photographers Association*

20

21

22

23

24

25

26

27

28

---