CALEB R. TROTTER, Cal. Bar No. 305195
Email: CTrotter@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
JAMES M. MANLEY, Ariz. Bar No. 031820*
Email: JManley@pacificlegal.org
Pacific Legal Foundation
3241 E. Shea Blvd. # 108
Phoenix, Arizona 85028
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
*Pro Hac Vice Pending
*[Additional Counsel on Following Page]*

*Attorneys for Plaintiffs American Society of Journalists and Authors, Inc.,
and National Press Photographers Association*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| AMERICAN SOCIETY OF JOURNALISTS AND AUTHORS, INC., and NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of the State of California, <br><br> Defendant. | Case No.: 2:19-cv-10645-PSG (KS) <br> Judge: Hon. Philip S. Gutierrez <br> Hearing Date: TBD <br> Time: TBD <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JEREMY B. TALCOTT, Cal. Bar No.  311490
Pacific Legal Foundation
1212 W. Amerige Ave.
Fullerton, California 92833
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: JTalcott@pacificlegal.org

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................4

MEMORANDUM IN SUPPORT OF PLAINTIFFS'
APPLICATION FOR A TEMPORARY RESTRAINING ORDER ......................8

I.   LEGAL AND FACTUAL BACKGROUND...................................8

   A.   Legal Background of AB 5 .........................................................8

   B.   The Harm to Journalists from AB 5 ...........................................10

   C.   AB 5's Unconstitutionally Narrow Exemptions .........................13

II.  STANDARD OF DECISION.........................................................14

III. ANALYSIS....................................................................................15

   A.   Likelihood of Success on the Merits..........................................15

      1.   The Equal Protection Clause Forbids Arbitrary Exemptions
           to Economic Regulations ......................................................15

      2.   The Speech and Press Clauses of the First Amendment Forbid
           Differential Treatment Based on the Content or Method of Speech .......16

         a.  AB 5 Limits the Definition of Professional Services Based on the
             Content of Speech ..........................................................17

         b.  AB 5 Limits the Definition of Professional Services Based on What
             Medium of Expression a Speaker Uses....................................18

   B.   Journalists Will Suffer Irreparable Harm from the Violation of Their
        Constitutional Rights..................................................................19

   C.   The Balance of Equities Weighs in Journalists' Favor..............20

   D.   Preliminary Relief Would Serve the Public Interest..................21

IV.  CONCLUSION...............................................................................21

CERTIFICATE OF SERVICE ......................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ........................................................15

*Arkansas Writers' Project, Inc. v. Ragland*,
    481 U.S. 221 (1987)........................................................................17

*Carey v. Brown*,
    447 U.S. 455 (1980)........................................................................16

*Citizens for Free Speech, LLC v. County of Alameda*,
    62 F. Supp. 3d 1129 (N.D. Cal. 2014)............................................20

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994)..........................................................................17

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989).................................................................11–12

*Dynamex Operations West, Inc. v. Superior Court of Los Angeles*,
    4 Cal. 5th 903 (2018) .....................................................................8–9

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..........................................................20

*Gonzales v. San Gabriel Transit, Inc.*,
    2019 WL 4942213 (Cal. Ct. App. Oct. 8, 2019) ..............................9

*Harwin v. Goleta Water Dist.*,
    953 F.2d 488 (9th Cir. 1991) ..........................................................18

*Hoffman v. Int'l Longshoremen's & Warehousemen's Union,
    Local No. 10*, 492 F.2d 929 (9th Cir. 1974) ...................................14

*Jacobellis v. Ohio*,
    378 U.S. 184 (1964).........................................................................18

*Ladd v. Law & Tech. Press*,
   762 F.2d 809 (9th Cir. 1985) ........................................................17

*Merrifield v. Lockyer*,
   547 F.3d 978 (9th Cir. 2008) ........................................................16

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
   460 U.S. 575 (1983)........................................................17

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)........................................................15

*Muniz v. Hoffman*,
   422 U.S. 454 (1975)........................................................14

*Nixon v. Shrink Missouri Gov't PAC*,
   528 U.S. 377 (2000)........................................................17

*Police Dep't of City of Chicago v. Mosley*,
   408 U.S. 92 (1972)........................................................16

*Preminger v. Principi*,
   422 F.3d 815 (9th Cir. 2005) ........................................................21

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015)........................................................16–18

*Rhorabough v. California Dep't of Corr.*,
   2006 WL 2401928 (E.D. Cal Aug. 18, 2006)........................................................14

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations*,
   48 Cal. 3d 341 (1989) ........................................................9

*Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959 (9th Cir. 2002)........................................................19, 21

*Sanders County Republican Cent. Committee v. Bullock*,
   698 F.3d 741 (9th Cir. 2012) ........................................................19

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ........................................................20

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ..................................................................21

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ..................................................................19

*Winter v. National Resources Defense Council*,
    555 U.S. 7 (2009)............................................................14–15, 19–21

**Statutes**

Cal. Labor Code § 246 ..................................................................................11

Cal. Labor Code § 2750.3, *et seq.* ................................................................8

Cal. Labor Code § 2750.3(a)(1) ....................................................................9

Cal. Labor Code § 2750.3(a)(1)(B)...........................................................9, 11

Cal. Labor Code § 2750.3(c)(1) ..................................................................13

Cal. Labor Code § 2750.3(c)(2)(B)..............................................................18

Cal. Labor Code § 2750.3(c)(2)(B)(i)–(viii), (xi)...........................................13

Cal. Labor Code § 2750.3(c)(2)(B)(ix).....................................................13, 18

Cal. Labor Code § 2750.3(c)(2)(B)(x)..........................................................13

Cal. Labor Code § 2750.3(j) ..........................................................................9

Cal. Labor Code § 3600 ..............................................................................11

Cal. Un. Ins. Code § 1251 ............................................................................11

Cal. Un. Ins. Code § 2625 ............................................................................11

Cal. Un. Ins. Code § 3303 ............................................................................11

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice
    and Procedure § 2948.1 (2013)...........................................................19

Twitter post by Assemblywoman Lorena S. Gonzalez,
    https://twitter.com/LorenaSGonzalez/status/
    1197546573158158336?s=20..........................................................................10

Cal. Dep't of Industrial Relations, Exemptions from the overtime
    laws, https://www.dir.ca.gov/dlse/faq_overtimeexemptions.htm .......................9

Kilkenny, Katie, *Everyone is Freaking Out*,
    Hollywood Reporter, Oct. 17, 2019,
    https://www.hollywoodreporter.com/news/everybody-is-freaking-
    freelance-writers-scramble-make-sense-new-california-law-
    1248195................................................................................................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

On behalf of their members, Plaintiffs American Society of Journalists and Authors (ASJA) and the National Press Photographers Association (NPPA) (collectively "Journalists") respectfully move for an order temporarily enjoining enforcement of Assembly Bill 5 (AB 5, codified at Cal. Labor Code § 2750.3, *et seq.*), to the extent it draws unconstitutional content-based distinctions about who can independently contract ("freelance"), limiting certain speakers to 35 submissions per client, per year, and precluding some freelancers from making video recordings. When AB 5 goes into effect January 1, 2020, Defendant should be enjoined from enforcing the law to the extent its content-based distinctions unduly burden Journalists' First and Fourteenth Amendment rights.

## I. LEGAL AND FACTUAL BACKGROUND

### A. Legal Background of AB 5

California recently enacted AB 5, which codifies and expands the independent contractor test established in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018). *Dynamex* created a new three-part test that requires independent contractors to be classified as employees under certain California wage orders, unless the hiring entity proves that:

(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact, (B) that the worker performs work that is outside the usual course of the hiring entity's business, and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Id*. at 964. *See also* Cal. Labor Code § 2750.3(a)(1). Failure to prove any element of this ABC test results in the independent contractor being classified as an employee. *Id*. The *Dynamex* ABC test overruled a prior multi-factor balancing test that considered the economic realities of the employment relationship. *See S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989). Under *Borello*, freelancers like the Journalists represented here worked as independent contractors for decades. Clark Dec. ¶¶ 4–5; Dotinga Dec. ¶ 2; Grant Dec. ¶ 2; Feulner Dec. ¶¶ 2, 5; Osterreicher Dec. ¶ 2.

*Dynamex* was limited to the "suffer or permit to work" standard in California wage orders and "equivalent or overlapping non-wage order allegations arising under the Labor Code." *Gonzales v. San Gabriel Transit, Inc.*, 2019 WL 4942213, at *14 (Cal. Ct. App. Oct. 8, 2019). Wage orders govern issues like minimum wage, overtime pay, meals, and lodging. Professionals engaged in "original and creative" work, like Plaintiffs' members, are largely exempt from wage orders, and thus *Dynamex* had little direct effect on their work.[1]

By contrast, the new AB 5 legislation applies the strict *Dynamex* ABC test to the entire Labor Code, the Unemployment Insurance Code, and wage orders. Cal. Labor Code § 2750.3(a)(1). AB 5's expansion of the ABC test means that freelancers like the writers, photographers, and videographers who comprise Plaintiffs' memberships must be classified as employees of the publishers for which they produce content because content creation is "the usual course of the hiring entity's business." Cal. Labor Code § 2750.3(a)(1)(B). AB 5 also grants specific enforcement authority to Defendant "[i]n addition to any other remedies available," to bring an action for injunctive relief. Cal. Labor Code § 2750.3(j). This new enforcement authority means that even freelancers who wish to work independently

---

[1] https://www.dir.ca.gov/dlse/faq_overtimeexemptions.htm

can be forced to become employees. Indeed, the sponsor of AB 5 has encouraged proactive use of the enforcement authority granted by the law.[2]

In short, AB 5 threatens to end the freelance careers of journalists who are not exempted from the bill's ABC test.

## B.    The Harm to Journalists from AB 5

ASJA and the NPPA are two of the leading voices for freelance writers and news photographers in the United States. Dotinga Dec. ¶ 2, ECF No. 23; Osterreicher Dec. ¶ 9, ECF No. 22. ASJA was founded in 1948 and is the nation's largest professional organization of independent nonfiction writers. Dotinga Dec. ¶ 2. Its membership consists of freelance writers of magazine articles, trade books, and many other forms of nonfiction writing, each of whom has met exacting standards of professional achievement. Dotinga Dec. ¶ 2.

Chartered in 1946, NPPA is the nation's leading professional organization for visual journalists. Osterreicher Dec. ¶ 9. Its membership includes news photographers from print, television, and electronic media. *Id.* At the filing of this lawsuit, NPPA counted 536 members in the State of California. *Id.* On behalf of its members, NPPA works to support its members' copyrights and opposes violations of First Amendment rights to report on news and matters of public concern. *Id.* AB5 implicates both.

These organizations brought this lawsuit to vindicate their members' rights to speak as independent professional freelancers.

Reclassifying freelance journalists as employees brings significant new costs and disadvantages. For professionals engaged in "original and creative" work, one large financial penalty wrought by AB 5 is their loss of federal tax deductions for business expenses. Journalists also face a financial burden as a result of this re-

---

[2] https://twitter.com/LorenaSGonzalez/status/1197546573158158336?s=20

classification, in the form of added costs to pay unemployment taxes[3], workers' compensation taxes[4], state disability insurance[5], paid family leave[6], and sick leave.[7] *See* Clark Dec. ¶¶ 10, 20, ECF No. 25. Some of these costs are borne by the client-turned-employer, but they all make the freelancer's work more expensive—and thus less attractive—to the employer. As a result, clients are reducing the amount of work given to California journalists, and some have stopped doing business with California journalists entirely. *See* Clark Dec. ¶ 20; Dotinga Dec. ¶¶ 8, 14; Grant Dec. ¶ 6, ECF No. 26; Osterreicher Dec. ¶ 14. This burden on freelancers' ability to market and/or license their communicative work is a direct result of their classification as employees under AB 5's "usual course of the hiring entity's business" prong. Cal. Labor Code § 2750.3(a)(1)(B). The threat of enforcement has already resulted in lost income opportunities for freelancers. Clark Dec. ¶¶ 20–21; Dotinga Dec. ¶ 14; Osterreicher Dec. ¶ 16.

In addition to these unavoidable costs of re-classification, erstwhile freelancers who are forced to become employees because of AB 5 will also lose ownership of the valuable copyright to their creative work and control of their workload. Clark Dec. ¶¶ 9, 11–12, 25; Dotinga Dec. ¶¶ 5, 7–10, 12; Grant Dec. ¶¶ 3, 6–7, 10; Feulner Dec. ¶¶ 4, 7–9, 11, ECF No. 24; Osterreicher Dec. ¶¶ 10–12, 15.

Control over the copyright of their work is especially pressing for freelance photographers, who routinely license their work but retain ownership of the copyright. Feulner Dec. ¶ 11; Osterreicher Dec. ¶¶ 10–12. Under the Copyright Act, the copyright in a work created by an independent contractor photographer is owned by the creator. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989).

---

[3] Cal. Un. Ins. Code § 1251.
[4] Cal. Labor Code § 3600.
[5] Cal. Un. Ins. Code § 2625.
[6] Cal. Un. Ins. Code § 3303.
[7] Cal. Labor Code § 246.

However, the copyright in a work created by an employee is owned by the employer. *Id*. Writers, too, benefit substantially from the ability to republish work that they create as freelancers. Clark Dec. ¶ 9; Dotinga Dec. ¶ 10. Freelance journalists who are forced to become employees due to AB 5 will lose the copyright to their work. Clark Dec. ¶ 9; Dotinga Dec. ¶ 10; Osterreicher Dec. ¶¶ 10–12.

Control over their workload is a primary concern for every freelancer. Indeed, control is what leads many freelancers to make the choice to work independently. Clark Dec. ¶¶ 11–12, 25; Dotinga Dec. ¶¶ 7–9, 12; Grant Dec. ¶¶ 6–7, 10; Feulner Dec. ¶¶ 4, 7–8; Osterreicher Dec. ¶ 15. In a tumultuous industry that continues to lay off employees by the thousands, freelancers find safety in flexibility. Clark Dec. ¶¶ 5, 8, 12–13; Dotinga Dec. ¶¶ 8–9, 12–13; Grant Dec. ¶ 6; Feulner Dec. ¶¶ 2, 4, 7–8; Osterreicher Dec. ¶¶ 14–15. Rather than being tied to a single employer, freelancers are able to adapt their workload to their financial needs, balance their work with their other responsibilities, and spread their workload across multiple clients to minimize risk. Clark Dec. ¶¶ 4, 12, 14; Dotinga Dec. ¶¶ 3, 7, 9; Grant Dec. ¶¶ 4, 7; Feulner Dec. ¶¶ 4, 12–13; Osterreicher Dec. ¶ 15. That flexibility even extends to business decisions, for example the choice to attend a conference or event is entirely the freelancers'. Clark Dec. ¶ 10; Dotinga Dec. ¶ 4. In addition, a freelancer can deduct these and other business expenses on their federal taxes, which an employee is not able to deduct. Clark Dec. ¶ 10; Dotinga Dec. ¶¶ 4, 11; Grant Dec. ¶ 8; Feulner Dec. ¶ 10. They are also able to maintain benefits like healthcare and retirement accounts, regardless of the number of publishers they produce content for or the frequency and quantity of their work. Dotinga Dec. ¶¶ 4, 11; Feulner Dec. ¶ 10. And that flexibility is even more important in the digital space which, unlike the traditional print model, allows for a higher volume of submissions to a greater variety of publications. Clark Dec. ¶¶ 13, 15–17; Dotinga Dec. ¶ 16. Losing the freedom to freelance would upend years-long careers built on this freedom and

flexibility. Clark Dec. ¶ 21; Dotinga Dec. ¶ 13; Grant Dec. ¶¶ 4, 11; Feulner Dec. ¶¶ 14–15; Osterreicher Dec. ¶ 16.

## C.  AB 5's Unconstitutionally Narrow Exemptions

As dramatic a shift as AB 5 represents, the legislature responded to intense lobbying efforts by granting dozens of seemingly random exemptions to the strict three-part ABC test. Among its many exemptions, AB 5 exempts people who work pursuant to "a contract for 'professional services.'" Cal. Labor Code § 2750.3(c)(1). These exempt professionals remain subject to the existing *Borello* independent contractor test. *Id*. "Professional services" are defined as marketers, human resources administrators, travel agents, graphic designers, grant writers, fine artists, IRS enrolled agents, payment processing agents through an independent sales organization, estheticians, electrologists, manicurists, barbers, and cosmetologists. Cal. Labor Code § 2750.3(c)(2)(B)(i)–(viii), (xi). Additionally, still photographers, photojournalists, freelance writers, editors, and newspaper cartoonists are included in "professional services," but with important limitations at issue here: (1) these speaking professions are limited to 35 "content submissions" per client, per year, Cal. Labor Code § 2750.3(c)(2)(B)(ix) and (x); and (2) any video recording is expressly excluded from the still photography and photojournalism exemption, Cal. Labor Code § 2750.3(c)(2)(B)(ix). Striking these limits on the definition of "professional services" would fully protect Journalists' right to freelance on the same terms as other speaking professionals who are already included in the definition of "professional services" and would resolve Journalists' constitutional claims against AB 5. A temporary restraining order would allow Journalists to continue their work as independent professionals while the Court considers their motion for preliminary injunction.

The definition of "professional services" violates the First Amendment because it imposes penalties on certain photographers and writers who exceed the

---

35-submission limit, and because it limits the definition of professional services based on who uses video as a medium of expression. Both are content-based restrictions on journalists. Plaintiffs' members are working journalists, authors, photographers, and videographers who face an immediate and irreparable chilling effect on their First Amendment activity because of the content-based limits on freelancing imposed by AB 5's definition of "professional services." These limits violate both the Equal Protection Clause of the Fourteenth Amendment and the Free Speech and Press Clauses of the First Amendment. AB 5 goes into effect on January 1, 2020; enforcement of these limits on the definition of "professional services" should be temporarily enjoined to maintain the status quo until the Court rules on Journalists' pending motion for preliminary injunction.

## II.   STANDARD OF DECISION

The purpose of a temporary restraining order is simply to "preserve the status quo pending a hearing." *Hoffman v. Int'l Longshoremen's & Warehousemen's Union, Local No. 10*, 492 F.2d 929, 933 (9th Cir. 1974), *aff'd sub nom. Muniz v. Hoffman*, 422 U.S. 454 (1975). That is all that ASJA and NPPA seek here—the ability for journalists to continue working as independent contractors without the content-based restrictions imposed by AB 5 until the Court can decide whether AB 5's new limitations on journalists survive scrutiny under the Constitution.

"Requests for temporary restraining orders are governed by the same general standards that govern the issuance of a preliminary injunction." *Rhorabough v. California Dep't of Corr.*, 2006 WL 2401928, at *1 (E.D. Cal. Aug. 18, 2006). A temporary restraining order and preliminary injunction to prevent Defendant's enforcement of AB 5's content-based limits on freelancing are appropriate because: (1) Journalists are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. National*

---

*Resources Defense Council*, 555 U.S. 7, 20 (2009). The Ninth Circuit has articulated a variation of the *Winter* test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

Journalists face an intolerable choice between exercising their First Amendment rights or compliance with AB 5's 35-submission limit and video recording exclusion. Only a temporary restraining order will prevent that unconstitutional Hobson's choice. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (recognizing that confronting a "Hobson's choice" amounts to irreparable harm). Journalists are entitled to temporary relief in order to prevent immediate, severe, and irreparable harm that would occur if Defendant is permitted to enforce AB 5 before the Court has the opportunity to resolve their motion for a preliminary injunction.

## III.   ANALYSIS

**A.   Likelihood of Success on the Merits**

### 1.   The Equal Protection Clause Forbids Arbitrary Exemptions to Economic Regulations

As explained more fully in Journalists' preliminary injunction memorandum, ECF No. 12-1 at 14–16, AB 5's definition of professional services draws arbitrary distinctions between speaking professionals based on the content of their speech and the mode of their expression. Those arguments are incorporated here by reference. By limiting writers and photographers to 35 submissions and generally prohibiting certain freelancers from recording video, AB 5 imposes a special burden on the content these speakers produce, in the form of differential tax treatment, the employment taxes and other regulatory and practical burdens discussed above that do not apply to other freelancers. The arbitrary distinctions drawn by AB 5 between

different kinds of freelancers are subject to strict scrutiny, because "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972). It is presumptively unconstitutional to draw arbitrary distinctions between speaking professionals, and the government bears the burden to prove otherwise. *Carey v. Brown*, 447 U.S. 455, 459–71 (1980). As explained more fully in Journalists' preliminary injunction memorandum, Defendant will not be able to meet his burden under strict scrutiny and Journalists are likely to succeed on the merits of their Equal Protection claim.[8]

### 2. The Speech and Press Clauses of the First Amendment Forbid Differential Treatment Based on the Content or Method of Speech

As explained more fully in Journalists' preliminary injunction memorandum, ECF No. 12-1 at 16–21, even if AB 5's definition of "professional services" did not fail under the Equal Protection Clause, it is nevertheless unconstitutional under the First Amendment because its distinctions are based entirely on either (1) the content of speech; or (2) what medium of expression a speaker uses. Those arguments are incorporated here by reference.

Content-based distinctions like those drawn by AB 5 are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). The burden is on Defendant to justify a rule that singles out freelance writers, editors, newspaper cartoonists, still photographers, and photojournalists from the definition of professional services that applies to other

---

[8] Nor can AB 5's arbitrary exemptions survive even under rational basis review. *See* Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 12-1 at 14–16, discussing *Merrifield v. Lockyer*, 547 F.3d 978, 988-89 (9th Cir. 2008).

---

speaking professionals like marketers and graphic artists. *Id*. This is a "heavy burden," which requires Defendant to offer evidence of a causal link between the limits AB 5 imposes on "professional services" and a compelling government interest. *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 379 (2000) ("This Court has never accepted mere conjecture as adequate to carry a First Amendment burden ...."). *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) (Regulatory exemptions "may diminish the credibility of the government's rationale for restricting speech in the first place."). Defendant will not be able to meet his burden under strict scrutiny and Journalists are likely to succeed on the merits of their First Amendment claims.

### a.     AB 5 Limits the Definition of Professional Services Based on the Content of Speech

As explained more fully in Journalists' preliminary injunction memorandum, ECF No. 12-1 at 18–20, it is unconstitutional to target freelance journalists for especially unfavorable treatment. *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 583 (1983) (striking down a tax on paper and ink because it "singled out the press for special treatment[.]"); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987) (striking down a sales tax on periodicals that exempted "religious, professional, trade, or sports periodical[s.]").

Like the unconstitutionally narrow tax exemption struck down in *Arkansas Writers' Project*, AB 5's professional services exemption is "triggered by the publication of ideas," and denies the freedom to freelance based entirely on the content of a freelancer's expression. *Ladd v. Law & Tech. Press*, 762 F.2d 809, 815 (9th Cir. 1985). As in *Arkansas Writers' Project*, the only way to know if AB 5's professional services exemption applies is through "official scrutiny of the content of publications." 481 U.S. at 230. The ability to freelance rises or falls based on whether expression is deemed marketing or editorial, graphic design or photography,

---

grant writing or news reporting—the only way to know if the "professional services" exemption applies is to analyze the content of the expression.

AB 5 "singl[es] out the press as a whole" for unfavorable treatment under California labor law, denying full freedom to freelance only to those writers and photographers who do not fit within the content-based exemptions for fine artists, marketing, graphic design, and grant writing. Cal. Labor Code § 2750.3(c)(2)(B).

The Supreme Court has consistently held that the government cannot discriminate in the First Amendment context unless it can show that the discrimination is necessary to serve a substantial governmental interest. *Harwin v. Goleta Water Dist.*, 953 F.2d 488, 490 (9th Cir. 1991); *Reed*, 135 S. Ct. at 2226. The sponsor of AB 5 has admitted that the 35-submission limit was not tailored to achieve a significant governmental interest; rather, it was "a little arbitrary."[9] Arbitrary line drawing does not meet the First Amendment's high standard. *Id.*

### b.    AB 5 Limits the Definition of Professional Services Based on What Medium of Expression a Speaker Uses

As explained more fully in Journalists' preliminary injunction memorandum, ECF No. 12-1 at 20–21, in addition to the 35-submission limit discussed above, AB 5's limits on video recording impose content-based limits on which freelancers can record video. Specific types of content creators, including fine artists, marketers, and graphic designers are free to take and use videos to communicate their ideas, but freelance photographers and journalists are explicitly denied that freedom. Cal. Labor Code § 2750.3(c)(2)(B)(ix).

Video recording is a form of expression protected by the First Amendment. *Jacobellis v. Ohio*, 378 U.S. 184, 187 (1964) ("Motion pictures are within the ambit of the constitutional guarantees of freedom of speech and of the press."). AB 5's exclusion of video recording from the definition of "professional services" for

___
[9] https://www.hollywoodreporter.com/news/everybody-is-freaking-freelance-writers-scramble-make-sense-new-california-law-1248195

journalists reaches into the journalist's toolbox and micromanages how information can be gathered and communicated. The undue and chilling burdens created by AB 5's exclusion of video recording are an affront to core First Amendment freedoms.

AB 5 provides no rational justification, and certainly no substantial justification, for its content-based line drawing. As explained more fully in Journalists' preliminary injunction memorandum, they are likely to succeed on the merits of their First Amendment claims that AB 5's content-based line drawing is unconstitutional.

**B.    Journalists Will Suffer Irreparable Harm from the Violation of Their Constitutional Rights**

A plaintiff seeking preliminary relief must show a likelihood of irreparable harm. *Winter*, 555 U.S. at 22. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A Charles Alan Wright, Arthur R. Miller, *et al*., Federal Practice and Procedure § 2948.1 (2013). Indeed, "[u]nder the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 973–74 (9th Cir. 2002); *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (same).

Because Journalists raise substantial constitutional claims, no further showing of irreparable injury is necessary and "the burden shifts to the government to justify the restriction." *See Sanders County Republican Cent. Committee v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012). On January 1, 2020, Journalists will have only two options absent temporary relief: engage in expressive activities as they have throughout their careers as freelance journalists—an option that enforcement of AB 5 forecloses—or comply with AB 5's 35-submission limit and video recording

exclusion. Even now, the full effects of AB 5 are being felt as opportunities for California journalists vanish in the face of AB 5's pending effective date. Dotinga Dec. ¶ 14. Thus, Journalists require temporary relief for the brief period of time between the date AB 5 takes effect and the date this Court can resolve the pending motion for a preliminary injunction.

## C.    The Balance of Equities Weighs in Journalists' Favor

A plaintiff seeking preliminary relief must show that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. To assess the balance of hardships, the court "balance[s] the interests of all parties and weigh[s] the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). Mere "inconvenience" to the government does not compare to the hardship imposed by "the potential loss of a constitutionally protected right" like the right to write, photograph, and publish. *Citizens for Free Speech, LLC v. County of Alameda*, 62 F. Supp. 3d 1129, 1143 (N.D. Cal. 2014).

In the absence of unconstitutional limits on the definition of professional services, journalists will be subject to the same freelancing rules that apply to other speaking professionals already afforded full freedom to freelance by AB 5. Defendant will still be able to enforce California labor law with respect to journalists, as has been the case for decades under *Borrello*, but, critically, journalists will maintain the freedom to freelance under AB 5's exception for professional services. Any harms Defendant might imagine are "entirely speculative and in any event may be addressed by more closely tailored regulatory measures." *Ezell v. City of Chicago*, 651 F.3d 684, 710 (7th Cir. 2011). The balance of equities favors Journalists.

**D.    Preliminary Relief Would Serve the Public Interest**

A motion for preliminary relief must show "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Upholding First Amendment values is always in the public interest: "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1129 (9th Cir. 2011) (quote omitted); *Sammartano*, 303 F.3d at 974 ("[It] is always in the public interest to prevent the violation of a party's constitutional rights." (quote omitted)); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Given the primacy of the constitutional rights at stake, a temporary restraining order is in the public interest.

## IV.    CONCLUSION

The freedom to write, photograph, and publish freely is at the core of the protections guaranteed by the First Amendment. By subjecting those core freedoms to freelancing rules that do not apply to other speaking professions, AB 5's definition of professional services is unconstitutionally narrow, in violation of both the Equal Protection Clause of the Fourteenth Amendment and the Free Speech and Press Clauses of the First Amendment.

A temporary restraining order is appropriate to maintain the status quo and enjoin enforcement of AB 5 to the extent it imposes a 35-submission limit on certain speakers and to the extent it limits the definition of professional services based on what medium of expression a speaker uses pending the resolution of Journalists' motion for a preliminary injunction.[10]

---

[10] Per L.R. 7-19, counsel for Defendant is identified as Jose Zelidon-Zepeda, California Department of Justice, 455 Golden Gate Ave., Suite 11000, San Francisco, California 94102; Telephone: (415) 703-5871; Email: jose.zelidonzepeda@doj.ca.gov.

1      DATED: December 31, 2019.

2                             Respectfully submitted,

3

4                             By___/s/ Caleb R. Trotter_____

5                                 CALEB R. TROTTER

6                           CALEB R. TROTTER
                          (Cal. Bar No. 305195)

7                           Pacific Legal Foundation
                          930 G Street

8                           Sacramento, California 95814
                          Telephone:  (916) 419-7111

9                           Facsimile:  (916) 419-7747

10                        Email:  CTrotter@pacificlegal.org

11                        JAMES M. MANLEY

12                        (Ariz. Bar No. 031820*)
                       Pacific Legal Foundation

13                        3241 E. Shea Blvd. #108
                       Phoenix, Arizona 85028

14                        Telephone: (916) 419-7111

15                        Facsimile: (916) 419-7747
                       Email: JManley@pacificlegal.org

16                        *Pro Hac Vice Pending

17                        JEREMY B. TALCOTT

18                        (Cal. Bar No.  311490)

19                        Pacific Legal Foundation

20                        1212 W. Amerige Ave.
                       Fullerton, California 92833

21                        Telephone: (916) 419-7111

22                        Facsimile: (916) 419-7747
                       Email: JTalcott@pacificlegal.org

23

24                        *Attorneys for Plaintiffs American Society of*

25                        *Journalists and Authors, Inc., and National*

26                        *Press Photographers Association*

27

28

---

Memorandum in Support of Plaintiffs'
Application for Temporary Restraining
Order
          - 22 -           Case No. 2:19-cv-10645

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on December 31, 2019, I caused a true and correct copy

3    of the foregoing to be served on the following counsel for Defendant via facsimile

4    and email:

5          Jose Zelidon-Zepeda
           California Department of Justice
6          455 Golden Gate Ave.
           Suite 11000
7          San Francisco, California 94102
           Telephone: (415) 703-5871
8          Facsimile: (415) 703-5843
           Email: jose.zelidonzepeda@doj.ca.gov
9
10         *Counsel for Defendant Xavier Becerra, in his official capacity at Attorney
           General of California*
11

12

13         DATED: December 31, 2019.

14                                          By /s/ Caleb R. Trotter
                                            CALEB R. TROTTER
15                                          (Cal. Bar No. 305195)
                                            Pacific Legal Foundation
16                                          930 G Street
                                            Sacramento, California 95814
17                                          Telephone: (916) 419-7111
                                            Facsimile: (916) 419-7747
18                                          Email: CTrotter@pacificlegal.org
19

20                                          JAMES M. MANLEY
21                                          (Ariz. Bar No. 031820*)
                                            Pacific Legal Foundation
22                                          3241 E. Shea Blvd. #108
                                            Phoenix, Arizona 85028
23                                          Telephone: (916) 419-7111
                                            Facsimile: (916) 419-7747
24                                          Email: JManley@pacificlegal.org
25                                           *Pro Hac Vice Pending
26

27

28

---

JEREMY B. TALCOTT
(Cal. Bar No.  311490)
Pacific Legal Foundation
1212 W. Amerige Ave.
Fullerton, California 92833
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: JTalcott@pacificlegal.org

*Attorneys for Plaintiffs American Society
of Journalists and Authors, Inc., and
National Press Photographers
Association*