UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#33 (3/23 hrg off)

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge |
|---|---|
| Wendy Hernandez | Not Reported |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):**   The Court DENIES the motion for a preliminary injunction

Before the Court is Plaintiffs American Society of Journalists and Authors, Inc. ("ASJA") and National Press Photographers Association's ("NPPA") (collectively, "Plaintiffs") motion for preliminary injunction. *See* Dkt. # 12 ("*Mot.*"). Defendant Xavier Becerra ("Defendant") opposes, *see* Dkt. # 36 ("*Opp.*"), and Plaintiffs replied, *see* Dkt. # 38 ("*Reply*"). The Court held a hearing on the matter on March 11, 2020. Having considered the moving, opposing, and reply papers and arguments made at the hearing, the Court **DENIES** the motion for a preliminary injunction.

I.   Background

   A.   AB 5

This case challenges Assembly Bill 5 (AB 5), codified at Cal. Lab. Code §§ 2750.3 et seq., a California law pertaining to the classification of employees and independent contractors.

In 2018, the California Supreme Court in *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 916 (2018), held that courts should apply a three-part test, the "ABC" test, to determine whether a worker is properly classified as an employee for certain purposes. The Court explained the test as follows:

> [U]nless the hiring entity establishes (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact, (B) that the worker performs work that is outside the usual course of the hiring entity's business, and (C) that the worker is customarily engaged in an independently established trade, occupation, or

Case 2:19-cv-10645-PSG-KS Document 44 Filed 03/20/20 Page 2 of 19 Page ID #:358

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

business, the worker should be considered an employee and the hiring business an employer under the suffer or permit to work standard in wage orders. The hiring entity's failure to prove any one of these three prerequisites will be sufficient in itself to establish that the worker is an included employee, rather than an excluded independent contractor, for purposes of the wage order.

*Id.* at 964.[1] The distinction between employees and independent contractors is significant because employers have obligations to employees that are not afforded to independent contractors. *See id.* at 912. The Court explained the import of the employee/independent contractor distinction in the following way: "[w]age and hour statutes and wage orders were adopted in recognition of the fact that individual workers generally possess less bargaining power than a hiring business and that workers' fundamental need to earn income for their families' survival may lead them to accept work for substandard wages or working conditions. The basic objective of wage and hour legislation and wage orders is to ensure that such workers are provided at least the minimal wages and working conditions that are necessary to enable them to obtain a subsistence standard of living and to protect the workers' health and welfare." *Id.* at 952. These objectives supported "a very broad definition of the workers who fall within the reach of the wage orders." *Id. Dynamex* applied the ABC test to all employees and workers covered by California Industrial Wage Commission ("IWC") wage orders. *Id.* at 964.[2]

On September 18, 2019, the California Legislature codified the ABC test adopted in *Dynamex* by enacting AB 5, which applies the ABC test to the entire Labor Code, the Unemployment Insurance Code, and wage orders. *See* A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019) ("AB 5"); Cal. Lab. Code § 2750.3. The Legislature found that "[t]he misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality," and AB 5's purpose was to ensure those workers "who are currently exploited by being misclassified as independent contractors," have basic rights and protections, and cited benefits to the state and other employers of proper classification. AB 5 § 1. Under AB 5, the ABC test is the standard test for ascertaining whether

---

[1] "In California, wage orders are constitutionally-authorized, quasi-legislative regulations that have the force of law." *Dynamex*, 4 Cal. 5th at 914 n.3.

[2] The Court explained that the broad standard also benefits "those law-abiding businesses that comply with the obligations imposed" by state labor laws, and benefits "the public at large, because if the wage orders' obligations are not fulfilled the public will often be left to assume responsibility for the ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions." *Dynamex*, 4 Cal. 5th at 953.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

a worker is an employee, however, the law creates certain exceptions for categories of workers that remain subject to the multi-factor "*Borello*" standard, under *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989). *See, e.g.*, Cal. Lab. Code § 2750.3(c)(1)–(2). As relevant here, AB 5 contains an exemption from the *Dynamex* test for "a contract for 'professional services.'" *See id.* § 2750.3(c)(1). This is defined to include, among a list of other professions, photographers or photojournalists or freelance writers, editors or newspaper cartoonists who do not license or provide content submissions to the putative employer more than 35 times per year, *id.* § 2750.3(c)(2)(B)(ix) & (x) ("35-submission limit"), and the exemption provided to photographers and photojournalists does not apply to "an individual who works on motion pictures," *id.* § 2750.3(c)(2)(B)(ix) ("videography exception" or "motion picture exception").

    B.    <u>Plaintiffs and Alleged Burden of AB 5</u>

ASJA is a 1,100-member non-profit association of independent non-fiction authors. *See Declaration of Randy Dotinga*, Dkt. # 23 ("*Dotinga Decl.*"), ¶ 2. The association was founded in 1948, and serves as a voice and resource for freelance writers and book authors. *Id.*

NPPA was chartered in 1946, and is a leading professional organization for visual journalists. *Declaration of Michey H. Osterreicher*, Dkt. # 22 ("*Osterreicher Decl.*"), ¶ 9. Its membership includes news photographers from print, television, and electronic media. *Id.* NPPA has 536 members in California. *Id.*

Plaintiffs assert that reclassifying freelancers as employees will bring costs and disadvantages, including: added costs to pay unemployment taxes, workers' compensation taxes, state disability insurance, paid family leave, and sick leave. *Mot.* 10:19–23. Plaintiffs assert that the costs will make a freelancer's work "more expensive—and thus less attractive—to the employer." *Id.* 10:23–11:1. Declarations submitted by freelance journalists state that they will lose, and have lost, employment opportunities. *See Declaration of Jobeth McDaniel Clark*, Dkt. # 25 ("*Clark Decl.*"), ¶ 20 ("AB 5 is already harming me and my colleagues as employers blacklist California workers rather than face harsh penalties, additional costs and taxes, and widespread uncertainty about the law."); *Osterreicher Decl.* ¶ 16; *Dotinga Decl.* ¶ 14.

Additionally, freelancers categorized as employees will "lose ownership of the copyright to their creative work and control of their workload." *Mot.* 11:7–11. In general, under the Copyright Act, the copyright in a work created by an independent contractor photographer is owned by the creator, while the copyright in a work created by an employee is owned by the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

employer. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 750–51 (1989). Freelance photographers and journalists' declarations attest that control over copyright work is a significant benefit of freelance work, which can allow additional income. *See Clark Decl.* ¶ 9; *Dotinga Decl.* ¶ 10; *Osterreicher Decl.* ¶¶ 10–12; *Declaration of Brian Feulner*, Dkt. # 24 ("*Feulner Decl.*"), ¶ 11.

Another concern is control over workload; freelance photographers and journalists describe this control as the reason they choose to work independently. *See Clark Decl.* ¶¶ 11–12, 25; *Dotinga Decl.* ¶¶ 7–9, 12; *Feulner Decl.* ¶¶ 4, 7–8; *Osterreicher Decl.* ¶ 15; *Declaration of Spencer Grant*, Dkt. # 26 ("*Grant Decl.*"), ¶¶ 6–7, 10. This flexibility includes the ability to deduct business expenses on their federal taxes, *see Clark Decl.* ¶ 10, *Dotinga Decl.* ¶¶ 4, 11, and maintain benefits like healthcare and retirement accounts, regardless of the number of publishers they produce content for or the frequency and quantity of their work, *see Dotinga Decl.* ¶¶ 4, 11, *Feulner Decl.* ¶ 10.

      C.      Procedural Background

On December 17, 2019, Plaintiffs filed this lawsuit, alleging that the 35-submission limit and videography exception that apply to specific exemptions in AB 5 violate their members' constitutional rights. *See generally Complaint*, Dkt. #1 ("*Compl.*"). Plaintiffs seek declaratory and injunctive relief, and an award of attorneys' fees and costs. *See id.* at 15–16. Plaintiffs sued Defendant in his role as Attorney General of California. *See id.* ¶ 16.

Plaintiffs now move for a preliminary injunction. *See generally Mot.* Specifically, Plaintiffs request that the Court preliminarily enjoin AB 5's 35-submission limit and videography exception. *See Reply* 2:10–14.

II.      Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (quotation marks and citation omitted); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must demonstrate each of the following elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury to the plaintiff if injunctive relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) an advancement of the public interest. *See Winter*, 555 U.S. at 20, 22. A preliminary injunction may also be appropriate "when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

plaintiff's favor," so long as the other *Winter* factors are met. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and modification omitted) (allowing for a post-*Winter* "sliding scale" analysis in preliminary injunction inquiries where "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another").[3]

III.     Discussion

The Court addresses each of the *Winter* factors in turn.

   A.     Likelihood of Success on the Merits

Plaintiffs' complaint contains four claims against Defendants for violations of the U.S. Constitution's Fourteenth Amendment Equal Protection Clause and First Amendment based on two challenged provisions of AB 5: Cal. Labor Code §§ 2750.3(c)(2)(B)(ix)[4] &

---

[3] The parties dispute whether Plaintiffs are seeking a preliminary injunction or mandatory injunction, and thus what legal standard is applicable. *See Opp.* 7:1–6; *Reply* 2–4.  The Court agrees with Plaintiffs that the *Winter* test is applicable here.

[4] This section defines "Professional services" to include: "Services provided by a still photographer or photojournalist who do not license content submissions to the putative employer more than 35 times per year.  This clause is not applicable to an individual who works on motion pictures, which includes, but is not limited to, projects produced for theatrical, television, internet streaming for any device, commercial productions, broadcast news, music videos, and live shows, whether distributed live or recorded for later broadcast, regardless of the distribution platform.  For purposes of this clause a 'submission' is one or more items or forms of content produced by a still photographer or photojournalist that: (I) pertains to a specific event or specific subject; (II) is provided for in a contract that defines the scope of the work; and (III) is accepted by and licensed to the publication or stock photography company and published or posted.  Nothing in this section shall prevent a photographer or artist from displaying their work product for sale." Cal. Lab. Code § 2750.3(c)(2)(B)(ix).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

2750.3(c)(2)(B)(x)[5]. *See generally Compl.* The Court turns first to Plaintiffs' Equal Protection Clause claims and then to the First Amendment claims.

>  *i.  Equal Protection Clause*

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008). This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne*, 473 U.S. at 439. "As a general rule, legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citing *McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961)). "Accordingly, [the Supreme] Court's cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id.* (citations omitted).

"The first step in equal protection analysis is to identify the [defendant's asserted] classification of groups." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166–67 (9th Cir. 2005) (citing *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995)) (internal quotations omitted). "The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Id.* "An equal protection claim will not lie by conflating all persons not injured into a preferred class receiving better treatment than the plaintiff." *Id.* (internal quotations omitted). "The groups need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014).

---

[5] This section defines "Professional services" to include: "Services provided by a freelance writer, editor, or newspaper cartoonist who does not provide content submissions to the putative employer more than 35 times per year. Items of content produced on a recurring basis related to a general topic shall be considered separate submissions for purposes of calculating the 35 times per year. For purposes of this clause, a 'submission' is one or more items or forms of content by a freelance journalist that: (I) pertains to a specific event or topic; (II) is provided for in a contract that defines the scope of the work; (III) is accepted by the publication or company and published or posted for sale." Cal. Lab. Code § 2750.3(c)(2)(B)(x).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

The "professional services" exemption in AB 5 exempts freelance writers, editors, newspaper cartoonists, still photographers, and photojournalists if they do not exceed the 35-submission limit; while the exemptions for services provided by graphic designers, grant writers, human resource administrators, and fine artists, for example, are not limited to 35 submissions. *See* Cal. Lab. Code § 2750.3(c)(2)(B)(i)–(xi). Second, the exemption for "*still* photographers and photojournalists" does not apply to "an individual who works on motion pictures," which is defined to include "projects produced for theatrical, television, internet streaming for any device, commercial productions, broadcast news, music videos, and live shows, whether distributed live or recorded for later broadcast, regardless of the distribution platform." *Id.* § 2750.3(c)(2)(B)(ix) (emphasis added). This same limitation does not apply to the exemptions for other listed "professional services." *See id.* § 2750.3(c)(2)(B)(i)–(xi).

Plaintiffs argue that AB 5 draws distinctions which are arbitrary because the State has no basis to distinguish among freelancers, for example: "[f]reelance graphic artists can submit unlimited infographics to a newspaper; freelance photojournalists are capped at 35 submissions." *Mot.* 15:23–16:10. But the two groups, those professions that are subject to the limitations and those that are not, are not "similarly situated"; they are of different occupations. *See Opp.* 10. For example, grant writers and graphic designers may not necessarily publish a high volume of articles annually with the same publisher, as photographers, photojournalists, and freelance writers do. *See Opp.* 8:14–26; *Thornton*, 425 F.3d at 1166–67 ("Evidence of different treatment of unlike groups does not support an equal protection claim."). The differences between these occupations is directly relevant to AB 5, which seeks to properly classify workers. *See* AB 5 § 1. However, even assuming the two groups are similarly situated, there need only be a rational basis for the distinctions, and AB 5 meets that standard.

Plaintiffs do not argue that AB 5 includes a suspect classification. Plaintiffs' only argument that heightened review applies is that AB 5 implicates fundamental rights, specifically, free speech rights under the First Amendment. *See Mot.* 14:12–24. Plaintiffs argue that drawing arbitrary distinctions between speaking professionals renders the law presumptively unconstitutional. *See id.* 14:18–22 (citing *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972); *Carey v. Brown*, 447 U.S. 455, 459–71 (1980)). Both of the cases Plaintiffs cite in support, however, involved statutes that prohibited certain types of picketing, and treated labor and nonlabor picketing differently for the purposes of the prohibition. *See Mosley*, 408 U.S. at 93–95; *Brown*, 447 U.S. at 459–71. Those cases directly prohibited speech, for instance, in *Mosley*, the Plaintiff would be arrested if he continued his speech activity of picketing. *See Mosley*, 408 U.S. at 93. Here, in contrast, AB 5 does not directly regulate or prohibit speech, but regulates the employment relationship. Moreover, as another court has explained, "[a]lthough

Case 2:19-cv-10645-PSG-KS Document 44 Filed 03/20/20 Page 8 of 19 Page ID #:364

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | | Date | March 20, 2020 |
|---|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | | |

the Court has on occasion applied strict scrutiny in examining equal protection challenges in cases involving First Amendment rights, it has done so only when a First Amendment analysis would itself have required such scrutiny." *Wagner v. Fed. Election Comm'n*, 793 F.3d 1, 32 (D.C. Cir. 2015). As discussed below, the Court concludes that a First Amendment analysis does not require heightened scrutiny. Accordingly, the Court concludes that AB 5 does not "categorize[] on the basis of an inherently suspect characteristic," nor does it "jeopardize[] the existence of a fundamental right," and thus it does not warrant heightened review. *See Nordlinger*, 505 U.S. at 10.

Under rational basis review, a statute bears "a strong presumption of validity," and "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "Where there are 'plausible reasons' for [California's] action, 'our inquiry is at an end.'" *Id.* (citing *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). "In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger*, 505 U.S. at 11 (internal citations omitted). Moreover "the absence of 'legislative facts' explaining the distinction '[o]n the record,' has no significance in rational-basis analysis," and a "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns, Inc.*, 508 U.S. at 315 (internal citation omitted) (citing *Nordlinger*, 505 U.S. at 15); *see also Clements v. Fashing*, 457 U.S. 957, 963 (1982) ("Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them.").

There is a legitimate state interest here. Section 1 of AB 5 sets forth a statement of purpose: "[t]he misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality." AB 5 § 1. The Legislature's stated intent in enacting AB 5 is:

> to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave. By

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

> codifying the California Supreme Court's landmark, unanimous *Dynamex* decision, this act restores these important protections to potentially several million workers who have been denied these basic workplace rights that all employees are entitled to under the law.

*Id.*

Defendant argues that there is a "plausible reason" for the distinctions in AB 5. As to the 35-submission limit, the "Legislature could have reasonably concluded that the former group [including marketers, graphic designers, grant writers, travel agents] does not perform the same type of work [as photographers, photojournalists, freelance writers, and editors], and that a 35-submission limit was not warranted for those occupations." *Opp.* 10:3–9. A 35-submission limit is "readily ascertainable" for photographers and journalists, but not for marketers and grant writers, for instance, and it "is rational to infer that photographers, photojournalists, and freelance writers who submit more than 35 items per year to a single publisher are more like employees than those who submit . . . fewer," and thus to exempt them "would contribute to the systemic harm associated with misclassification." *Id.* 10:11–20. The Court agrees that it would be rational to determine that the nature of the employment relationship in certain industries, including for photographers and editors, would more readily resemble employees if their submission number to a certain employer was high; it is rational that that same measure may not apply to, for instance, a grant writer. There are material differences between these occupations bearing on whether a submission limit makes sense for employment classification purposes. *See Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1058, 1062 (9th Cir. 2018) (rejecting equal protection challenge to state statute that extended prevailing wage law to delivery drivers of ready-mix concrete, and concluding the district court wrongly disregarded certain differences between ready-mix drivers and other drivers that the legislature could have relied on); *see also Dandridge v. Williams*, 397 U.S. 471, 485 (1970) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."). The same is true for the distinction between the exemption for photographers and photojournalists which is subject to the motion picture industry exception, and the other exemptions, like grant writers, which are not. It is not clear how the motion picture industry exception would necessarily apply to other occupational exemptions. *See* Cal. Lab. Code § 2750.3(c)(2)(B)(i)–(xi).

Courts have concluded that economic regulations that distinguish based on industry are not necessarily irrational, and that the State must be given "leeway to approach a perceived problem incrementally." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1155–56 (9th Cir. 2004) (rejecting an equal protection challenge to a living wage city ordinance that targeted only

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

employers of a certain size within a certain zone of the City of Berkeley, and concluding it was "certainly rational . . . for the City to treat Marina businesses differently from their competitors outside the Marina"). For instance, in *Fortuna Enterprises, L.P. v. City of Los Angeles*, the court concluded that an ordinance requiring only hotels within a zone of a certain airport to pay a living wage did not violate the equal protection clause, refusing to examine the legislative purposes and explaining "it makes no difference that the Ordinance here only targets hotels in a certain area of the City near the airport, as the Ninth Circuit has said that legislative bodies must be able to approach problems, such as depressed wages, 'incrementally,'" and that exceptions for workers party to a collective bargaining agreement "could rationally arise from the expectation that unionized workers are better able to protect their interests with regard to wages than non-unionized workers." 673 F. Supp. 2d 1000, 1014 (C.D. Cal. 2008); *see also Woodfin Suite Hotels, LLC v. City of Emeryville*, No. C 06-1254 SBA, 2006 WL 2739309, at *21 (N.D. Cal. Aug. 23, 2006) (holding that wage ordinance applicable to large hotels but not other large businesses meets rational basis scrutiny). Here, statutory differences between the exemptions could rationally be related to characteristics of the differing industries and worker-relationships in those industries, including differences in independence exerted, and the State's decision to attack a problem incrementally does not necessarily render the law irrational.

Thus, AB 5 is dissimilar from the law in *Merrifield v. Lockyer*, 547 F.3d 978, 988–89 (9th Cir. 2008), on which Plaintiffs rely for their contention that the law is arbitrary. *See Mot.* 14–16. In that case, the Ninth Circuit found no rational basis to require pest controllers dealing with mice, rats, or pigeons to obtain a license relating to pesticide use, while exempting similar pest controllers dealing with bats, raccoons, skunks, and squirrels from the licensing requirement, despite being more likely than the former group to encounter pesticides. *See Merrifield*, 547 F.3d at 988, 992. The Ninth Circuit pointed out that the government had "undercut its own rational basis for the licensing scheme by excluding [plaintiff] from the exemption." *Id.* at 992. As the Ninth Circuit has since explained, *Merrifield* involved a "unique set of facts," where the challenged legislative classification "actually contradict[ed]" the purposes of the statute, or otherwise suggested "improper favoritism." *Allied Concrete & Supply Co.*, 904 F.3d at 1065–66. Here, in contrast, Plaintiffs have not shown that imposing a 35-submission limit on some occupational exemptions contradicts the State's interest in proper classification, or otherwise suggests favoritism. The same is true for the motion picture industry exception.

Plaintiffs have failed to carry their burden "to negative every conceivable basis which might support" AB 5. *Beach Commc'ns, Inc.*, 508 U.S. at 315. Plaintiffs have not explained why the 35-submission limit and motion picture industry exception as applied to some workers might not be a rational means of distinguishing what test should be applied to determine who is

Case 2:19-cv-10645-PSG-KS Document 44 Filed 03/20/20 Page 11 of 19 Page ID #:367

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

an "employee" and who an "independent contractor," based on the various characteristics of the industry or profession. The Court cannot conclude that the distinctions made are wholly arbitrary, lacking any plausible basis.[6] *See Clements*, 457 U.S. at 963; *see also Olson v. California*, No. CV 19-10956-DMG (RAOx), 2020 WL 905572, at *1, 9 (C.D. Cal. Feb. 10, 2020).

  *ii.*   First Amendment

  Plaintiffs argue that AB 5 limits the definition of "professional services" based on content of speech, triggering First Amendment protection and requiring strict scrutiny. *See Mot.* 18–21. If a law "imposes content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231 (2015); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) ("Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."). By contrast, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Turner*, 512 U.S. at 642. "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct . . . [T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011)). The question is whether conduct with a "significant expressive element" drew the legal remedy or the statute has the "inevitable effect of singling out those engaged in expressive activity." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986). "[G]enerally applicable economic regulations affecting rather than targeting news publications" pass constitutional muster. *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 896 (9th Cir. 2018) (generally applicable wage law targeting employer use of employee wages regulated conduct and was not subject to First Amendment scrutiny).

  Here, AB 5 applies a particular test to determine if a worker is considered an "employee" as opposed to an "independent contractor," to the Labor Code, the Unemployment Insurance Code, and wage orders. *See* AB 5. It is thus directed at economic activity generally – the employee-employer relationship – it does not directly regulate or prohibit speech. However, according to Plaintiffs, AB 5 imposes a burden on protected First Amendment activities, and thus requires First Amendment scrutiny.

---

[6] Plaintiffs do not assert that the distinctions in AB 5 were driven by animus, or that the analysis would otherwise require heightened scrutiny. *See generally Mot.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

The Court turns first to whether the challenged provisions of AB 5 are content-based or content-neutral, and then applies the appropriate level of scrutiny.

### a. *Content-Neutral or Content-Based*

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner*, 512 U.S. at 643. A law is content-based if it "target[s] speech based on its communicative content," or "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2226–27. On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner*, 512 U.S. at 643. "The purpose, or justification, of a regulation will often be evident on its face." *Id.* at 642. The first step is to "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017) (quoting *Reed*, 135 S. Ct. at 2227–28). Strict scrutiny is also applied if the law is facially neutral but "cannot be 'justified without reference to the content of the regulated speech,' or [was] adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* (quoting *Reed*, 135 S. Ct. at 2227).

### 1. *35-Submission Limit*

Plaintiffs explain that "[t]he only 'professional services' subject to AB 5's 35-submission limit are freelance writers, editors, newspaper cartoonists, still photographers, and photojournalists." *Reply* 1:24–26. They argue that this imposes a burden on speech because "[t]he ability to freelance rises or falls based on whether expression is deemed marketing or editorial, graphic design or photography, grant writing or news reporting." *See Mot.* 19:12–15. But, as Defendant argues, AB 5 does not reference any idea, subject matter, viewpoint or substance of any speech; the distinction is based on if the individual providing the service in the contract is a member of a certain occupational classification. *See* Cal. Lab. Code § 2750.3(c)(2)(B)(i)–(xi); *Opp.* 12.

Defendant argues that the exemption is "speaker-based" not content-based. *See Opp.* 13. In *G.K. Ltd. Travel v. City of Lake Oswego*, the Ninth Circuit held that a sign ordinance was not content-based because it categorized by speaker: "officers decide whether an exemption applies by identifying the entity speaking through the sign without regard for the actual substance of the message." 436 F.3d 1064, 1078 (9th Cir. 2006). However, the Supreme Court has since clarified that "the fact that a distinction is speaker based does not, as the Court of Appeals

Case 2:19-cv-10645-PSG-KS Document 44 Filed 03/20/20 Page 13 of 19 Page ID #:369

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

seemed to believe, automatically render the distinction content neutral. Because '[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content,' we have insisted that 'laws favoring some speakers over others demand strict scrutiny *when the legislature's speaker preference reflects a content preference*' . . . [c]haracterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Reed*, 135 S. Ct. at 2230 (quoting *Turner*, 512 U.S. at 658) (internal citations omitted) (emphasis added). For instance, in *Turner*, the Court was considering "must-carry" provisions requiring cable television systems to devote a portion of their channels to transmitting local broadcast television stations. 512 U.S. at 626. The Court acknowledged that these "must-carry" provisions "distinguish[ed] between speakers in the television programming market," favoring broadcast programmers over cable programmers. *Id.* at 645, 657. But, the Court explained, "they do so based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry: Broadcasters, which transmit over the airwaves, are favored, while cable programmers, which do not, are disfavored." *Id.* at 645. "So long as they are not a subtle means of exercising a content preference, speaker distinctions of this nature," otherwise content-neutral, are not subject to strict scrutiny. *Id.*; *see also Doe v. Harris*, 772 F.3d 563, 575 (9th Cir. 2014).

The Court agrees that the challenged provisions in AB 5 are based on distinctions between speakers. AB 5 makes distinct exemptions from the ABC test for those "contract[s]" for "professional services," services including those by a "grant writer," "administrator of human resources," "fine artist," or "still photographer," regardless of whether the message is about politics or sports. *See* Cal. Lab. Code § 2750.3(c)(1)–(2). The relevant question is thus whether the speaker-based distinction "reflect[s] a content preference." *See Reed*, 135 S. Ct. at 2230; *Citizens for Free Speech v. Cty. of Alameda*, 194 F. Supp. 3d 968, 983–85 (N.D. Cal. 2016).

There is no indication that AB 5 reflects preference for the substance or content of what certain speakers have to say, or aversion to what other speakers have to say. *See Turner*, 512 U.S. at 658–59; *cf. Sorrell*, 564 U.S. at 564 (law prohibiting pharmacies and other regulated entities from selling or disseminating prescriber-identifying information for marketing, while allowing it for educational communications, "disfavor[ed] marketing," and thus "on its face burden[e]d disfavored speech by disfavored speakers"). The justification for these distinctions is proper categorization of an employment relationship, unrelated to the content of speech. *See* AB 5 § 1; *cf. Citizens for Free Speech*, 194 F. Supp. 3d at 984 (preference for official public signs justified based on importance of government information). Defendant has identified a governmental interest in proper classification of employees and independent contractors across industries, and in ensuring that employees receive all applicable protections under labor laws. *See* AB 5 § 1; *Dynamex*, 4 Cal. 5th at 912–13 (describing consequences of employee status).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

This interest is "unrelated to the suppression of free expression." *Turner*, 512 U.S. at 662. Defendant argues that "[i]t is rational to infer that photographers, photojournalists, and freelance writers who submit more than 35 items per year to a single publisher are more like employees than those who submit 35 items or fewer . . . and to exempt them would contribute to the systemic harm associated with misclassification," and this same measure may not be as readily ascertainable for other occupations, such as grant writers. *Opp.* 10:15–18. Placing a 35-submission limit on certain professions serves the State's interest of protecting its workforce by preventing misclassification of certain professionals as independent contractors when they resemble employees, and is unrelated to the content of the expression they produce. The same is true for the videography provision. AB 5 was not written in a way that suggests a motive to target certain content by targeting speakers, and Plaintiffs have pointed to none. There is no indication that AB 5 "cannot be justified without reference to the content of the regulated speech," nor is there any indication or argument by Plaintiffs that it was adopted because of disagreement with the message of the speech. *See generally Mot.*; Recycle *for Change*, 856 F.3d at 670; *Reed*, 135 S. Ct. at 2226–27. Accordingly, the Court concludes these provisions are content-neutral.

  *2. Videography or Motion Picture Industry Exception*

Plaintiffs make a separate argument that the videography or motion picture industry exception is subject to strict scrutiny because it differentially impacts medium. *See Mot.* 20–21. Plaintiffs state: "only photographers and photojournalists are specifically excluded from the definition of 'professional services' if they shoot video." *Reply* 1:26–28. Plaintiffs rely on *City of Cincinnati v. Discovery Network, Inc.*, in which the Court rejected the argument that commercial speech has "low value," and thus that the city could enact a "categorical ban on commercial newsracks," but permit other newsracks containing noncommercial handbills. 507 U.S. 410, 418, 420 (1993); *see also Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64–69 (1983) (holding a federal statute that prohibited the mailing of unsolicited advertisements for contraceptives could not be applied to the appellee's promotional materials). Plaintiffs argue that here, like *Discovery Network* and *Bolger*, AB 5 "denies access to video for freelancers" who fall within the exemption; but those cases found First Amendment problems with regulations that prohibited the use of newsracks or the mail based on the "content of the publication." *See Discovery Network, Inc.*, 507 U.S. at 418; *Bolger*, 463 U.S. at 64. By contrast, here, no speech is prohibited, and the exclusion from the *Borrello* test for individuals that "work[] on motion pictures" and similar projects does not hinge on the content of a message, but, as discussed above, is based on the occupation or industry of the individual providing the service. *See* Cal. Lab. Code § 2750.3(c)(2)(B)(ix); *Recycle for Change*, 856 F.3d at 670 ("A content-based law is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

one that targets speech based on its communicative content or applies to particular speech because of the topic discussed or the idea or message expressed."); *Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1044 n.7 (9th Cir. 2002) ("Because Honolulu Weekly was still free to distribute its paper, its reliance on [*Discovery Network*] is misplaced."). In addition, the Supreme Court has explained that "[i]t would be error to conclude, however, that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner*, 512 U.S. at 660–61. "The fact that a law singles out a certain medium, or even the press as a whole, 'is insufficient by itself to raise First Amendment concerns.'" *Id.* The Court is again not convinced that Plaintiffs' argument regarding a medium-based distinction warrants strict scrutiny.

### 3.  *Whether AB 5 Singles Out the Press*

Finally, Plaintiffs argue that AB 5 "single[s] out the press," and therefore requires strict scrutiny. *Mot.* 17–18. In *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue* the Supreme Court held that a law may not "single out the press," however, the Court made clear that "the States and the Federal Government can subject newspapers to generally applicable regulations without creating constitutional problems." 460 U.S. 575, 581 (1983). The Court explained that in contrast to a "generally applicable economic regulation," the challenged special use tax on ink and paper used in publications singled out the press. *Id.* at 581–83. Additionally, the tax targeted a small group of newspapers, which was due to the fact that the first $100,000 of paper and ink were exempt from the tax, the tax thus "single[d] out a few members of the press" for special treatment: the largest newspapers. *Id.* at 591. Similarly, in *Arkansas Writers' Project, Inc. v. Ragland*, the Supreme Court struck down a tax exemption which differentiated between magazines based on the content of those magazines: if articles in a magazine were "devoted to religion or sports" the magazine would be exempt. 481 U.S. 221, 229–31 (1987). As the Court has since explained, those cases "targeted a small number of speakers, and thus threatened to 'distort the market for ideas,'" and "[a]lthough there was no evidence that an illicit governmental motive was behind either of the taxes, both were structured in a manner that raised suspicions that their objective was, in fact, the suppression of certain ideas." *Turner*, 512 U.S. at 660–61; *see also Koala v. Khosla*, 931 F.3d 887, 896–97 (9th Cir. 2019) ("[I]t is sufficient to show the government acted with the intent to burden the press in order to plead a viable Free Press Clause claim, but it is not necessary to show invidious intent; where differential taxation of the press burdens the special interests protected by the First Amendment, it is presumptively unconstitutional.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

At first glance, there is some resemblance to *Minneapolis Star* here, where AB 5 differentially affects enumerated professions, which are part of the press. *See Minneapolis Star & Tribune Co.*, 460 U.S. at 581. However, the 35-submission limit is just one of many rules governing applicability of the ABC test to particular workers,[7] it does not uniquely single out the press in that it applies a unique burden, such as a special tax, on the press. Unlike *Minneapolis Star*, AB 5, which includes numerous statutory requirements, exemptions, and exceptions to determine which test applies for determination of employment status, does not uniquely burden the press to the exclusion of others, nor is there any differentiation among publications based on content, as in *Arkansas Writers' Project*. *See Minneapolis Star & Tribune Co.*, 460 U.S. at 581; *Arkansas Writers' Project, Inc.*, 481 U.S. at 229–31. Plaintiffs have pointed to nothing in the structure of AB 5 that indicates an intent to uniquely burden the press or particular ideas.

In sum, the Court concludes that the challenged exemptions in AB 5 are not content-based nor otherwise require heightened scrutiny.

        b.     Review

Defendant argues that because AB 5 is a generally applicable labor law, which is content-neutral, serves important governmental interests unrelated to the suppression of speech, and there is no evidence that it was adopted to favor or disfavor any message conveyed, a First Amendment challenge fails. *See Opp.* 15:25–16:10. But even if intermediate scrutiny applies, Plaintiffs have not demonstrated a likelihood of success on the merits.

A "content-neutral regulation will be sustained if 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *Turner*, 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). The requirement is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

---

[7] For instance, the "Professional Services" exemption applies to estheticians, but only if they, *inter alia*, set their own rates, set their own hours of work, have their own book of business, and maintain their own business license. *See* Cal. Lab. Code § 2750.3(c)(2)(B)(xi). The "Professional Services" exemption only applies if the hiring entity demonstrates various requirements are satisfied. *See id.* § 2750.3(c)(1)(A)–(F). Other exemptions apply to, for instance, commercial fishermen. *See id.* § 2750.3(b)(6).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

"'Narrow tailoring' does not require the government to adopt the 'least restrictive or least intrusive means of serving the statutory goal' when the regulation does not completely foreclose any means of communication." *Honolulu Weekly, Inc.*, 298 F.3d at 1045 (quoting *Hill v. Colorado*, 530 U.S. 703, 726 (2000)).

Defendant explains the governmental interest in the law as follows:

The Legislature found that "[t]he misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality." AB 5 § 1(c). In enacting AB 5, the Legislature intended "to ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law," including minimum wage, workers' compensation, unemployment insurance, paid sick leave, and paid family leave. *Id.* § 1(e) . . . By adopting the ABC test, AB 5 "restores these important protections to potentially several million workers who have been denied these basic workplace rights that all employees are entitled to under the law." AB 5 § 1(e).

*Opp.* 3:7–25. Defendant explains that the exemptions were created "for certain occupations and industries, where the Legislature felt the ABC test was not a good fit." *Id.* 4:5–7. The Legislature "considered various factors in deciding these exemptions," including whether an individual holds a professional license, whether "the worker is truly free from direction or control of the hiring entity (for example, workers providing hairstyling and barbering services who have their own set of clients and set their own rates)," or whether "they perform 'professional services,' as a sole proprietor or other business entity and meet specific indicia of status as independent businesses." *Id.* 4:7–22. The purpose was to "identify the hallmarks of true independent contractors" for the purpose of exemption from the ABC test. *Id.* 4:18–19.

The Court concludes that Defendant will likely satisfy its burden here. As discussed, Defendant has identified an important or substantial governmental interest in correcting misclassification of employees and independent contractors, and in ensuring that employees receive all applicable protections under labor laws, and the Court has concluded that that interest can be justified without reference to the content of expression and is unrelated to the suppression of free expression. Finally, Defendant will likely prevail in demonstrating that the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the State's interest in proper classification for purposes of labor law protections. Although a different submission limit may also have accomplished the State's goal, the State had a basis to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

require less than 35 submissions to be categorized under the *Dynamex* test for certain occupations, to achieve its aim of proper classification. Plaintiffs have provided the Court with no basis to conclude that the 35-submission limit is overly broad and that it unnecessarily burdens speech, nor have they done so for the videography exception. *See generally Mot.*

    *iii.    Conclusion*

The Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits or serious questions going to the merits on their Equal Protection and First Amendment claims.

    B.    <u>Likelihood of Irreparable Injury</u>

"[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is possible. *Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (quoting *Winter*, 555 U.S. at 22). Plaintiffs argue that because they "raise substantial constitutional claims, no further showing of irreparable injury is necessary." *See Mot.* 22:7–8.

An "alleged constitutional infringement will often alone constitute irreparable harm." *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (citing *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)). However, where a constitutional claim is "too tenuous," such a presumption is not warranted. *See id.* Here, the Court has already concluded that Plaintiffs are not likely to succeed on the merits of their constitutional claims, and thus the presumption of irreparable harm is "too tenuous." *See id.* Plaintiffs have not briefed any other basis on which to conclude that they would suffer irreparable harm absent an injunction. *See Mot.* 21–22; *Reply* 8–11.

    C.    <u>Balance of Hardships and Advancement of the Public Interest</u>

When the government is a party, the "last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). To qualify for injunctive relief, the plaintiffs must establish that "the balance of equities tips in [their] favor." *Winter*, 555 U.S. at 20. "In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-10645 PSG (KSx) | Date | March 20, 2020 |
|---|---|---|---|
| Title | American Society of Journalists and Authors, Inc., et al. v. Xavier Becerra | | |

Plaintiffs' only arguments regarding these factors are derivative of their arguments on the merits. *See Mot.* 22:14–23:14. The Court has already determined that Plaintiffs are unlikely to succeed on the merits of their claims. Defendant has provided reasons for why the balance of hardships and the public interest tip in its favor. *Opp.* 18:6–9 (arguing that enjoining the State's enforcement of AB 5 would "further delay the State's ability to effectively address the misclassification of workers and the public consequences of such misclassification, which the Legislature concluded warranted remediation"); AB 5 § 1; *see also Olson*, 2020 WL 905572, at *15. While the Court passes no judgment on the desirability or wisdom of AB 5, Defendant has presented a reasoned basis for concluding the legislation, which was fully considered by the Legislature, would promote the public interest. *See Opp.* 19:1–4; *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) ("The public interest may be declared in the form of a statute.") (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.4, at 207 (2d ed. 1995)). Considering the impact of an injunction on the State's ability to properly classify and provide protection of the labor laws to those that it determined should properly be classified as employees, the Court concludes that these two factors weigh in favor of Defendant.

### D. Summation

The Court concludes that Plaintiffs have not shown serious questions going to the merits, the critical factor. And, because Plaintiffs' arguments with regard to the final three *Winter* factors are derivative of their merits arguments, they have also failed to demonstrate likelihood of irreparable harm, that the balance of hardships tips in their favor, and advancement of the public interest. Accordingly, the *Winter* factors weigh against granting Plaintiffs' preliminary injunction.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for a preliminary injunction.

**IT IS SO ORDERED**.