**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMERICAN SOCIETY OF JOURNALISTS AND AUTHORS, INC.; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, <br> *Plaintiffs-Appellants*, <br><br> v. <br><br> ROB BONTA[*], Attorney General of the State of California, <br> *Defendant-Appellee.* | No. 20-55734 <br><br> D.C. No. <br> 2:19-cv-10645-PSG-KS <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, Chief District Judge, Presiding

Argued and Submitted June 11, 2021
Pasadena, California

Filed October 6, 2021

---

[*] Under Fed. R. App. P. 43(c)(2), Rob Bonta has been substituted for his predecessor, Xavier Becerra, as California Attorney General.

Before:  Consuelo M. Callahan and Danielle J. Forrest,
Circuit Judges, and Richard Seeborg,[**] District Judge.

Opinion by Judge Callahan

## SUMMARY[***]

### Civil Rights

The panel affirmed the district court's dismissal of a suit brought by the American Society of Journalists and Authors and the National Press Photographers Association challenging, on First Amendment and Equal Protection grounds, California's Assembly Bill 5 and its subsequent amendments, which codified the more expansive ABC test previously set forth in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 416 P.3d 1 (Cal. 2018), for ascertaining whether workers are classified as employees or independent contractors.

The ABC test permits businesses to classify workers as independent contractors only if they meet certain conditions. If a business cannot make that showing, its workers are deemed employees, and the business must comply with specific requirements, and state and federal labor laws. AB5 and its subsequent amendments, now codified at section 2778 of the California Labor Code, provides for certain

[**] The Honorable Richard Seeborg, Chief United States District Judge for the Northern District of California, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

occupational exemptions.    Because freelance writers,
photographers and others received a narrower exemption
than was offered to certain other professionals, plaintiffs
sued, asserting that AB5 effectuates content-based
preferences for certain kinds of speech, burdens journalism
and burdens the right to film matters of public interest.

The panel held that section 2778 regulates economic
activity rather than speech.  It does not, on its face, limit what
someone can or cannot communicate.  Nor does it restrict
when, where, or how someone can speak.  The statute is
aimed at the employment relationship—a traditional sphere
of state regulation.  The panel further acknowledged that
although the ABC classification may indeed impose greater
costs on hiring entities, which in turn could mean fewer
overall job opportunities for certain workers, such an
indirect impact on speech does not necessarily rise to the
level of a First Amendment violation.  The panel rejected
plaintiffs' assertion that the law singled out the press as an
institution and was not generally applicable.

Addressing the Equal Protection challenge, the panel
held that the legislature's occupational distinctions were
rationally related to a legitimate state purpose.

## COUNSEL

James M. Manley (argued), Caleb R. Trotter, and Jeremy Talcott, Pacific Legal Foundation, Sacramento, California, for Plaintiffs-Appellants.

Jose A. Zelidon-Zepeda (argued), Deputy Attorney General; Heather Hoesterey, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Office of the Attorney General, San Francisco, California; for Defendant-Appellee.

Ilya Shapiro and Trevor Burns, Cato Institute, Washington, D.C.; Manuel S. Klausner, Law Offices of Manuel S. Klausner, Los Angeles, California; for Amici Curiae Cato Institute, Reason Foundation, and Individual Rights Foundation.

Timothy Sandefur and Christina Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Arizona, for Amicus Curiae The Goldwater Institute.

Krystal B. Swendsboe and Hyok Frank Chang, Wiley Rein LLP, Washington, D.C., for Amicus Curiae The Independent Institute.

Daniel R. Suhr and Reilly Stephens, Liberty Justice Center, Chicago, Illinois, for Amicus Curiae Liberty Justice Center.

**OPINION**

CALLAHAN, Circuit Judge:

To confront the misclassification of employees as independent contractors, California passed Assembly Bill (AB) 5, then AB 2257, which codified a more expansive test for determining workers' statuses, albeit with certain occupational exemptions.  Because freelance writers, photographers, and others received a narrower exemption than was offered to certain other professionals, the American Society of Journalists and Authors, Inc., and the National Press Photographers Association (collectively, ASJA) sued, alleging violations of the First Amendment and Equal Protection Clause.  We conclude, however, that the laws do not regulate speech but, rather, economic activity.  We further conclude that the legislature's occupational distinctions are rationally related to a legitimate state purpose.  We therefore affirm the district court's dismissal of ASJA's suit.

I.

The California Supreme Court dramatically altered state labor law in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 416 P.3d 1 (Cal. 2018), by adopting the "ABC test" for ascertaining whether workers were employees or independent contractors.  That test permits businesses to classify workers as independent contractors only if they (a) are "free from the control and direction of the hirer," (b) perform work "that is outside the usual course of the hiring entity's business," and (c) are "customarily engaged in an independently established trade, occupation, or business."  *Id.* at 34.  If a business cannot make that showing, its workers are deemed employees, in which case the business must comply with certain requirements—

"paying federal Social Security and payroll taxes, unemployment insurance taxes and state employment taxes, providing worker's compensation insurance, and . . . complying with numerous state and federal statutes and regulations governing the wages, hours, and working conditions of employees." *Id.* at 5.

Before *Dynamex*, California courts applied the multi-factor test established in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 769 P.2d 399 (Cal. 1989). Under *Borello*, a worker's status turned primarily on the hiring entity's right to control the worker. *Id.* at 403–04. But courts also looked to several "secondary indicia" of employment, including the hiring entity's right to discharge workers at will, the length of the workers' services, and whether the work was part of the hiring entity's regular business.[1] *Id.* at 404. Importantly, no factor was dispositive; courts engaged in a case-by-case evaluation of the arrangement at issue. *Id.* at 407. This flexibility gave the California Supreme Court pause. Concerned that the *Borello*

---

[1] The other factors include

> whether the one performing services is engaged in a distinct occupation or business; . . . the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; . . . the skill required in the particular occupation; . . . whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; . . . the method of payment, whether by the time or by the job; . . . and whether the parties believe they are creating the relationship of employer-employee.

*Borello*, 769 P.2d at 404.

standard caused confusion and enabled businesses to evade labor requirements, the *Dynamex* court adopted the more rigid ABC test.  416 P.3d at 33–34.

Although *Dynamex* was initially limited to wage orders,[2] with *Borello* applying outside that context, the California legislature codified the ABC test and expanded its applicability through the enactment of AB 5.  The legislature gave several reasons for taking this step.  It found that misclassification caused workers to "lose significant workplace protections," deprived the state of needed revenue, and ultimately contributed to the "erosion of the middle class and the rise in income inequality."  AB 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019).  With AB 5, the legislature declared, it was protecting "potentially several million workers."  *Id.*

AB 5 did not apply *Dynamex* across the board, however, but specified that the *Borello* standard would continue governing many occupations and industries.  *See generally* Cal. Lab. Code § 2750.3.  For example, the law exempted from the ABC test licensed doctors, lawyers, architects, engineers, and accountants, as well as certain commercial fishermen, salesmen, and investment advisers, among many others.  *Id.* § 2750.3(b)(2)–(6).  It also exempted those engaged in enumerated "professional services," which were defined to include marketing, graphic design, grant writing,

---

[2] Wage orders are "quasi-legislative regulations" that "impose obligations relating to the minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees."  *Dynamex*, 416 P.3d at 5 & n.3.

barbery, cosmetology, and fine art.  *Id.* § 2750.3(c)(2)(B)(i),
(iv)–(vi), (xi).

At issue here are AB 5's "professional service"
exemptions for freelance workers, including freelance
writers and photographers.  *Id.* § 2750.3(c)(2)(B)(ix)–(x).
As originally enacted, AB 5 limited this exemption to
freelancers who submitted fewer than thirty-five pieces of
work to a single entity in a given year.  *Id.*  If a freelancer
stayed within that limit, *Borello* governed.  If he exceeded it,
*Dynamex* instead applied.  AB 5 also provided that the
exemption did not apply to photographers, photojournalists,
and videographers working on "motion pictures"—*i.e.*,
"projects produced for theatrical, television, internet
streaming for any device, commercial productions,
broadcast news, music videos, and live shows."  *Id.*
§ 2750.3(c)(2)(B)(ix).      *Dynamex*      governed      their
arrangements no matter the situation.

ASJA sued to enjoin the above limitations and thereby
expand the freelance exemptions.  In ASJA's view, the
submission limit and exclusion of "motion picture" workers
offended the Free Speech, Free Press, and Equal Protection
Clauses because they did not apply to other professionals,
such as marketers and artists, who enjoyed broader, or at
least differently contoured, exemptions from *Dynamex*'s
ABC test.  The restrictions burdened journalism, ASJA
claimed, by forcing freelancers to become employees,
thereby reducing their work opportunities and inhibiting
their "freedom to freelance."

ASJA moved for a preliminary injunction and for a
temporary restraining order.  The court denied the
restraining-order request and, after concluding that ASJA
was unlikely to prevail, declined to issue a preliminary
injunction.  It rejected ASJA's First Amendment argument,

finding that AB 5 regulated economic conduct, not speech, and that the law evinced no content preference. The court also held that AB 5 survived ASJA's Equal Protection challenge because the regulated occupations were not similarly situated and, even if they were, there was a rational basis for the legislature's occupational classifications.

ASJA appealed the district court's order, and California moved for dismissal of the underlying action. The court dismissed the suit for the same reasons that it denied the preliminary injunction, and ASJA appealed that order, too. We then dismissed ASJA's first appeal, holding that the denial of the preliminary injunction "merged" into the final judgment. No. 20-55408, Dkt. No. 32 (9th Cir. Aug. 20, 2020).

In the meantime, the California legislature amended AB 5 with AB 2257, which added new "professional service" exemptions and clarified existing ones.[3] *See* Cal.

---

[3] Exempted professionals now include creative marketers, human resources administrators, travel agents, graphic designers, grant writers, fine artists, payment processing agents, estheticians, electrologists, manicurists, barbers, cosmetologists, specialized performers hired by a performing arts company or organization to teach a master class, appraisers, foresters, real estate agents, home inspectors, and repossession agencies. Cal. Lab. Code § 2778(b)(2)(A)–(H), (L)–(O); *see also infra* n.5.

While the exemptions accorded to these services differ in their particulars, workers providing a "professional service" listed in AB 2257 must, in addition to satisfying their industry's individualized conditions, "maintain[] a business location . . . separate from the hiring entity," set their own hours "[o]utside of project completion dates and reasonable business hours," and "customarily and regularly exercise[] discretion and independent judgment in the performance of the services," among other requirements. Cal. Lab. Code § 2778(a).

Lab. Code § 2778.  As relevant here, AB 2257 dropped the thirty-five-submissions limit but bounded the freelance exemptions in other ways.  Now, for *Borello* to apply, freelance workers cannot "directly replac[e] an employee who performed the same work at the same volume for the hiring entity," "primarily perform the work at the hiring entity's business location," or be "restricted from working for more than one hiring entity."[4]  *Id.* § 2778(b)(2)(I)–(J).  The law remained largely the same in other respects.  Thus, notwithstanding AB 2257's changes, ASJA maintains that the law, now codified at section 2778 of California's Labor Code, continues to violate the First Amendment and Equal Protection Clause.[5]

## II.

Because the district court dismissed AJSA's suit while its appeal of the preliminary-injunction order was pending, the orders merged.  *See Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 730–31 (9th Cir. 2017) (describing the merger doctrine); *accord SEC v. Mt. Vernon Mem. Park*, 664 F.2d 1358, 1361–62 (9th Cir. 1982).  We thus begin— and ultimately end—with the dismissal order, which we

---

[4] The freelance exemption's revised conditions apply to services provided by still photographers, photojournalists, videographers, photo editors, *id.* § 2778(b)(2)(I); freelance writers, translators, editors, copy editors, illustrators, or newspaper cartoonists, *id.* § 2778(b)(2)(J); and content contributors, advisors, producers, narrators, or cartographers for journals, books, periodicals, evaluations, other publications, or educational, academic, or instructional works in any format or media, *id.* § 2778(b)(2)(K).

[5] We **GRANT** ASJA's motion to supplement the record with declarations showing that AB 2257 did not moot this appeal.  *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1020 n.3 (9th Cir. 2010).

review de novo.  *Butterfield v. Bail*, 120 F.3d 1023, 1024 (9th Cir. 1997).

## III.

### A.

The First Amendment, applied to states through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech or the press.  U.S. Const. amend. I. Governments cannot, therefore, "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). Such restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*  In ascertaining whether a speech-restricting law triggers this exacting standard of review, we consider whether it "defin[es] regulated speech by particular subject matter" or, more subtly, "by its function or purpose." *Id.*  Strict scrutiny applies in either case.  *Id.*  But before conducting that analysis, we must assess whether the law regulates speech in the first place.  *See, e.g.*, *United States v. Swisher*, 811 F.3d 299, 314 (9th Cir. 2016).

### 1.

The thrust of ASJA's First Amendment argument is that, under section 2778, a worker's likelihood of being classified as an employee, rather than an independent contractor, turns on the content of his work.  If the worker provides marketing services, for example, then *Borello* governs "provided that the contracted work is original and creative in character." Cal. Lab. Code § 2778(b)(2)(A).  If the worker instead produces art, then *Borello* applies when the work is "to be

appreciated primarily or solely for [its] imaginative, aesthetic, or intellectual content." *Id.* § 2778(b)(2)(F)(ii). Grant writers and graphic designers meanwhile enjoy broader exemptions from *Dynamex*. *Id.* § 2778(b)(2)(D)–(E). But for *Borello* to apply to a freelance writer or photographer, he must not replace an employee that performed the same workload, be restricted from working for other entities, or work primarily at the hirer's business location. *Id.* § 2778(b)(2)(I)–(J). In ASJA's view, these restrictions single out journalism and, more generally, effectuate content-based preferences for certain kinds of speech. ASJA concludes that because employees impose greater financial burdens on prospective hirers than do independent contractors, the law interferes with freelancers' right to speak for a profession.

There is a distinction, however, between "restrictions on protected expression" and "restrictions on economic activity." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Whereas the First Amendment may prohibit the former, it "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* Consistent with this view, the Supreme Court has rejected First Amendment challenges to the Fair Labor Standards Act and its exceptions, *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 192–94 (1946); the National Labor Relations Act, *Assoc. Press v. NLRB*, 301 U.S. 103, 130–33 (1937); the Sherman Act, *Assoc. Press v. United States*, 326 U.S. 1, 19–20 (1945); and taxes, *Leathers v. Medlock*, 499 U.S. 439, 447–49 (1991). These cases, and others like them, establish that an entity "cannot claim a First Amendment violation simply because it may be subject to . . . government regulation." *Univ. of Penn. v. EEOC*, 493 U.S. 182, 200 (1990).

Section 2778 fits within this line of cases because it regulates economic activity rather than speech. It does not, on its face, limit what someone can or cannot communicate. Nor does it restrict when, where, or how someone can speak. It instead governs worker classification by specifying whether *Dynamex*'s ABC test or *Borello*'s multi-factor analysis applies to given occupations under given circumstances. In other words, the statute is aimed at the employment relationship—a traditional sphere of state regulation. *See DeCanas v. Bica*, 424 U.S. 351, 356 (1976). Such rules understandably vary based on the nature of the work performed or the industry in which the work is performed, and section 2778 is no different in this regard.[6] But whether employees or independent contractors, workers remain able to write, sculpt, paint, design, or market whatever they wish.[7]

---

[6] Although not at issue here, federal employment regulations draw similar distinctions. *See generally*, 29 C.F.R. Subpt. D (setting forth exemptions from the Fair Labor Standards Act for "professional employees"). Like section 2778, those rules exempt lawyers, doctors, and architects from minimum-wage and overtime requirements. *Id.* §§ 541.301, 304. They also generally exempt "music, writing, . . . and the graphic arts," among others, as well as certain painters, cartoonists, novelists, and journalists. *Id.* § 541.302; *see also id.* § 541.300(a)(2)(ii) (exempting those whose work "[r]equir[es] invention, imagination, originality or talent in a recognized field of artistic or creative endeavor").

[7] Section 2778 thus differs from the laws deemed problematic in cases like *Reed*, 576 U.S. 155; *Sorrell*, 564 U.S. 552; and *Pacific Coast Horseshoeing School v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020), upon which ASJA relies. In *Reed*, the Court invalidated an ordinance restricting residents' display of signs—"a canonical First Amendment medium—on the basis of the language they contained," Note, *Free Speech Doctrine after* Reed v. Town of Gilbert, 129 Harv. L. Rev. 1981,

The ABC test may, as ASJA contends, make it more likely that some of its members are classified as employees. And that classification may indeed impose greater costs on hiring entities, which in turn could mean fewer overall job opportunities for workers, among them certain "speaking" professionals. But such an indirect impact on speech does not necessarily rise to the level of a First Amendment violation. After all, "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986); *cf. Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 470 (1997) ("The fact that an economic regulation may indirectly lead to a reduction in a[n] . . . advertising budget does not itself amount to a restriction on speech.").

Granted, economic regulations can still implicate the First Amendment when they are not "generally applicable" but instead target certain types of speech and thereby raise the specter of government discrimination. Hence, in *Minneapolis Star & Tribune v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983), the Supreme Court rejected a special-use tax on paper and ink products used exclusively by newspapers. The tax both singled out the press for special treatment, raising free-press problems, and targeted just a few newspapers, raising censorship concerns. *Id.* at 578–79. In *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987), the Court invalidated a state's selective taxation of

---

1993 (2016). *Sorrell* dealt with content-based prohibitions on disseminating information, an established form of speech. 564 U.S. at 563, 567–69. And *Pacific Coast Horseshoeing* concerned a law that "squarely" implicated the First Amendment by "regulat[ing] what kind of educational programs different institutions can offer to different students." 961 F.3d at 1069.

certain magazines but not religious, trade, or sports ones. And, relatedly, in *Simon & Schuster v. Members of New York Crime Victims Board*, 502 U.S. 105 (1991), the Court found unconstitutional a law requiring publishers of criminals' books to turn over an author's proceeds if the book concerned his or her crime. Notwithstanding the law's laudable goal of compensating victims, it imposed a content-based financial burden disincentivizing certain types of speech. *Id.* at 115–18; *see also Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 903 (9th Cir. 2018) (expounding on when economic regulations might implicate the First Amendment).

Section 2778 poses none of these problems, however. It does not target the press or a few speakers, because it applies across California's economy. That is, it establishes a default rule applying *Dynamex*'s ABC test to the classification of all work arrangements *unless* an arrangement falls within an exemption, in which case *Borello* applies. Freelancers and related professionals enjoy one exemption and may understandably want it broadened. But many occupations have no exemption at all; the ABC test governs their classification regardless of the circumstances. So if a freelance writer falls out of his exemption's scope—by, say, being restricted from working for more than one entity—he is not uniquely burdened. Rather, he is then treated the same as the many other workers governed by the ABC test. This distinguishes section 2778 from the newspaper-ink tax invalidated in *Minneapolis Star*, which was "without parallel in the State's tax scheme," 460 U.S. at 582, and the targeted burden at issue in *Simon & Schuster*, which "the State place[d] on no other income." 502 U.S. at 116.

We note, moreover, that the specific conditions complained of apply not only to journalists, but to all

freelance writers, photographers, and others in the state—including narrators and cartographers for journals, books, or "educational, academic, or instructional work[s] in any format or media." Cal. Lab. Code § 2778(b)(2)(I)–(K). As a result, those conditions do not single out the press as an institution. And contrary to ASJA's contention, the law is not rendered generally inapplicable just because some other professionals—among them lawyers, human-resource administrators, and creative marketers—enjoy different, or even broader, carveouts from the ABC test. *See Okla. Press*, 327 U.S. at 193 (rejecting the notion that federal labor law could not be applied to the press because it exempted "seamen, farm workers and others"). Indeed, we recently upheld AB 5 as a "generally applicable" law in another context, despite its exemptions, because it applies to employers generally. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 658–59 (9th Cir. 2021). "Labor laws typically include exemptions," we explained. *Id.* at 659 n.9.

Nor does section 2778 impose content-based burdens on speech, for even assuming that the ABC test constitutes an economic burden akin to a tax, its applicability does not turn on what workers say but, rather, on the service they provide or the occupation in which they are engaged. And although some regulated occupations "speak" as part of their professions, nothing about section 2778's text, structure, or purpose reflects a legislative content preference.[8] *See Reed*,

---

[8] ASJA argues that section 2778 may require state authorities to examine the content of a worker's message when determining whether *Borello* or *Dynamex* applies. This, ASJA contends, signals that the law impermissibly singles out speech based on its subject matter. That can be true, but it is not dispositive. *See Recycle for Change v. City of Oakland*, 856 F.3d 666, 671 (9th Cir. 2017) (collecting cases). A government might have to examine the contents of writings to determine

576 U.S. at 170.  Notably, the practice of most exempted professions—such as home inspectors, foresters, and fisherman—does not equate to "speech."  Other regulated services, which could constitute "speech," do not serve as stand-ins for particular subject matters.   These include freelance writers, graphic designers, and photo editors.  *Cf. Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 99 (2d Cir. 2006) ("The mere fact that [the rule] differentiates between categories of vendors—that is, vendors of written materials, paintings, photographs, prints and sculptures are exempt from its licensing requirement while other vendors are not— does not suggest that [it] targets particular messages and favors others." (emphasis omitted)).  Creative marketers will, of course, communicate about marketing, just as lawyers will about law.  But the inclusion of provisions specific to such "speaking" professionals does not, in our view, transform a broad-ranging, comprehensive employment law like section 2778 into a content-based speech regulation.  *Cf. Ohlralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.").  If it did, it is difficult to see how any occupation-specific regulation of speakers would avoid strict scrutiny.[9]  We decline ASJA's invitation to apply the First Amendment in this manner.

---

if someone is engaged in the unauthorized practice of law, for example, but that alone would not violate the First Amendment.  Furthermore, assessing a worker's duties in the employment setting is typically a fact-intensive inquiry concerning the nature of one's work.

[9] A legislature could conceivably define services or occupations so granularly that a court could isolate the speech's communicative intent as a defining distinction.

2.

ASJA separately challenges section 2778's application of the ABC test to freelancers working on "motion pictures." *See* Cal. Lab. Code § 2778(b)(2)(I)(i). According to ASJA, this provision burdens the right to film matters of public interest. We do not share this concern, as "motion pictures" refers to an industry or medium through which content is conveyed, and such distinctions do not typically implicate the First Amendment. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 660 (1994) ("[T]he fact that a law singles out a certain medium . . . is insufficient by itself to raise First Amendment concerns.") (citation omitted); *see also Assoc. Film Dist. Corp. v. Thornburgh*, 683 F.2d 808, 812–13 (3d Cir. 1983) (describing as "clearly content-neutral" a law regulating "trade practice legislation, directed at the motion picture industry as opposed to other industries, not because that industry communicates ideas, but rather because . . . the market structure of that industry is unique").

True, the provision defines "motion pictures" as including "theatrical or commercial productions, broadcast news, television, and music videos," Cal. Lab. Code § 2778(b)(2)(I)(i), but this does not signify a burden based on the "topic discussed or the idea or message expressed." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017) (quoting *Reed*, 576 U.S. at 163). Rather, the definition provides an illustrative, non-exclusive list of productions that constitute "motion pictures." So even if those examples equate to different subject matters, the law does not distinguish between them; whether "motion pictures" involve news or music, section 2778 treats those working on them the same.

B.

The Equal Protection Clause prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *Plyler v. Doe*, 457 U.S. 202, 216 (1982) ("The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike."). When a law burdens a fundamental right, like that to free speech, we apply strict scrutiny. *See Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002). But having found that section 2778 does not implicate the First Amendment, we review for a rational basis, asking only whether the statute's occupational classifications are "rationally-related to a legitimate governmental interest."[10] *Id.* (citation omitted).

This is a fairly forgiving standard, given the wide latitude afforded to states in managing their economies. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). We uphold economic classifications so long as "there is any reasonably conceivable state of facts that could provide a rational basis" for them. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Therefore, to prevail, the party attacking a law must "negate every conceivable basis which might have supported" the distinctions drawn. *Angelotti Chiropractic v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015) (internal quotation marks and citation omitted).

ASJA has not done that. In deciding whether and under what conditions *Dynamex*'s ABC test applies to a given occupation, California weighed several factors: the workers' historical treatment as employees or independent

---

[10] ASJA acknowledges the state's interest in properly classifying workers.

contractors, the centrality of their task to the hirer's business, their market strength and ability to set their own rates, and the relationship between them and their clients. *See generally* Cal. Bill Analysis, AB 5 (July 10, 2019). It is certainly conceivable that differences between occupations warrant differently contoured rules for determining which employment test better accounts for a worker's status.[11] It is also conceivable that misclassification was more rampant in certain industries and therefore deserving of special attention. "Legislatures may implement their program step by step . . . , adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *City of New Orleans*, 427 U.S. at 303 (citations omitted); *accord Angelotti*, 791 F.3d at 1085–86. And even if California could have better addressed misclassification some other way, or with greater precision, the Equal Protection Clause does not require it. *See Beach Commc'ns, Inc.*, 508 U.S. at 315 ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *see also Williamson*, 348 U.S. at 487–88 ("[T]he law need not be in every respect logically consistent with its aims to be constitutional."). So long as the law rests upon some rational basis—as it does here—our inquiry is at an end.

---

[11] Occupational classifications often survive Equal Protection challenges. *See, e.g.*, *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 28 (2015) (collecting examples); *see also id.* (noting states' power to "impose widely different taxes on various trades or professions" (quoting 1 J. Hellerstein & W. Hellerstein, State Taxation § 3.03 (3d ed. 2001–2005)). For example, a rule can apply to opticians but not optometrists, *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 486–91 (1955), or to dentists but no one else, *Semler v. Ore. State Bd. of Dental Examiners*, 294 U.S. 608, 610 (1935).

ASJA does not meaningfully challenge the conceivable bases underpinning section 2778's distinctions but, instead, likens them to those deemed unconstitutional in *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008).  We disagree with the comparison, as *Merrifield* "presented a unique set of facts."  *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1065 (9th Cir. 2018).  It involved a state licensure requirement applicable to pest controllers dealing with bats, raccoons, skunks, and squirrels but not pest controllers dealing with mice, rats, or pigeons.  *Merrifield*, 547 F.3d at 981–82.  In defending the law against a due process challenge, the state had argued that licensure was needed to educate workers about pesticide risks.  *Id.* at 987–88.  But since those eradicating mice, rats, and pigeons were more likely to encounter pesticides, the state had "undercut its own rational basis for the licensing scheme."  *Id.* at 992.

Unlike the situation in *Merrifield*, however, nothing about section 2778 suggests that its classifications "border[] on corruption, pure spite, or naked favoritism lacking any legitimate purpose."  *S.F. Taxi Coal. v. City and Cnty. of S.F.*, 979 F.3d 1220, 1225 (9th Cir. 2020) (explaining that *Merrifield* represents the "outer limit to the state's authority").  Instead, like many other employment laws, section 2778 permissibly subjects workers in different fields to different rules.

IV.

Section 2778's use of different worker-classification tests for different occupations under different circumstances does not implicate the First Amendment or violate the Equal Protection Clause.  The law regulates economic activity, not speech, and a rational basis supports the distinctions it draws.  We therefore affirm the dismissal of ASJA's suit

and, accordingly, need not address the denial of ASJA's request for a preliminary injunction.

**AFFIRMED.**